Filed 8/2/17

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re J.C., a Person Coming Under the Juvenile Court Law. | C080391 |
| THE PEOPLE, | (Super. Ct. No. JV130300) |
|       Plaintiff and Respondent, | |
|     v. | |
| J.C., | |
|       Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, James P. Arguelles, Judge. Reversed with directions.

Lauren E. Dodge, under appointment by the Court of Appeal, for Defendant and Appellant.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II and III.

1

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon, Melissa Lipon, Deputy Attorney General, for Plaintiff and Respondent.

In this case, we hold that mandatory lifetime sex offender registration pursuant to Penal Code section 290.008[1] for those adjudicated wards of the court based on the commission of certain sex offenses is not cruel and unusual punishment. We come to this conclusion because appellant has not established on this record that such registration is punishment.

When J.C. was 12 years old, the juvenile court adjudicated him a ward of the court based on his commission of a forcible lewd act (sodomy) on a five-year-old. (§ 288, subd. (b).) After J.C. failed at less restrictive commitments and was found to be in violation of his probation on three occasions, the juvenile court committed him to the Division of Juvenile Facilities (DJF). This commitment requires lifetime registration as a sex offender pursuant to section 290.008.

On appeal, J.C. contends lifetime sex offender registration for juveniles is cruel and unusual punishment under the Eighth Amendment of the United States Constitution. We reject this contention as we explain in the published portion of this opinion.

In the unpublished portion of this opinion, we address J.C.'s challenges to his commitment based on the juvenile court's errors in committing him before obtaining a risk assessment, subsequently relying on an inapplicable risk assessment tool, and misstating his maximum period of confinement. We shall remand for administration of an age-appropriate risk assessment and correction of the maximum term of confinement.

---

[1] Further undesignated statutory references are to the Penal Code.

## FACTUAL AND PROCEDURAL BACKGROUND

J.C. was born in December of 1996. His early years were marked by extreme neglect and abuse. He was removed from his mother at age five and placed in numerous foster homes until he was eventually adopted.

In 2010, when J.C. was 12 years old, he pushed a five-year-old boy to the ground and sodomized him. The juvenile court sustained a wardship petition alleging two counts, a forcible lewd and lascivious act upon a child less than 14 years of age (§ 288, subd. (b)(1)) and a non-forcible lewd and lascivious act upon a child less than 14 years of age (*id.,* subd. (a)). The court adjudged J.C. a ward of the court, placed him on probation, and committed him to the care and custody of his mother. The conditions of probation included participation in a sex offender treatment program. The court subsequently modified the order and dismissed the count charging the non-forcible act.

The following year J.C. admitted a violation of probation, being in the presence of minors under age 14 without the supervision of an adult. The court revoked and reinstated probation on the same terms.

In 2012 it was reported that J.C. inappropriately touched his disabled minor sister. J.C.'s (adoptive) mother stated she could no longer adequately supervise J.C. The juvenile court granted a motion to modify custody and J.C. was placed with Martin's Achievement Place group home. The People filed a new wardship petition, based on the same allegations that J.C. had committed two lewd and lascivious acts on his 12-year-old sister. A psychological evaluation reported that J.C. was not making progress at the sex offender's program at Martin's Achievement Place. J.C. admitted one lewd act, placing his mouth and tongue on his sister's breast, as a violation of probation. The second violation of probation and the petition were dismissed. The court committed J.C. to (level B) placement at Lakeside Academy in Michigan.

At first, J.C. did well there, but then stagnated in the sex offender treatment program. In late 2014, J.C. inappropriately touched another student at the group home,

3

grabbing a boy's buttocks, and Lakeside Academy requested that he be moved. A violation of probation was filed based on this incident.

The juvenile court sustained the violation of probation and considered the question of proper placement. The juvenile court recognized that if J.C. were sent to DJF,[2] he would be required to register as a sex offender; the court commented that minors were usually not required to register so as not to "mess up the rest of their lives by hanging this tag on them." J.C.'s counsel suggested placement at the Victory Outreach Program, a one-year Christian program for recovery from addiction. He admitted the program usually did not take sex offenders and provided no sex offender counseling. The court required that juvenile sex offender counseling be a part of any placement and requested information on the availability of such counseling.

Probation reported that no juvenile sex offender counseling was available at Victory Outreach; however, the program reported that it would allow J.C.'s mother to take him to counseling. There were concerns that J.C. might face retaliation if others learned of his past and that he would have potential contact with children while at the program.

The juvenile court found Victory Outreach was not a good fit and committed J.C. to DJF, with a maximum confinement of 10 years,[3] not to exceed the statutory limitation of commitment to age 23. The court ordered J.C. to register as a sex offender.

---

[2] "The California Youth Authority (CYA) was renamed the California Department of Corrections and Rehabilitation, Division of Juvenile Justice, effective July 1, 2005. The Division of Juvenile Facilities (DJF) is part of the Division of Juvenile Justice." (*In re M.B.* (2009) 174 Cal.App.4th 1472, 1475, fn. 2.) The trial court (and many cases) use DJJ (Division of Juvenile Justice) and DJF seemingly interchangeably; we shall use "DJF."

[3] We explain in the unpublished portion of our opinion that this number should have been eight years, a conclusion with which the Attorney General agrees.

# DISCUSSION

## I

### *Lifetime Sex Offender Registration for Juveniles*

J.C. contends lifetime sex offender registration for an offense committed as a juvenile is cruel and unusual punishment. He challenges the rationale underpinning the registration requirement, contending juvenile sex offenders have low rates of recidivism and registration does not promote public safety. He argues that mandatory lifetime registration for juveniles fails to distinguish between adult and juvenile offenders as required by recent United States Supreme Court case law. He contends such registration constitutes punishment because although the intent is regulatory, the effect is punitive.

A.  *Forfeiture*

The People contend J.C. has forfeited this issue by failing to raise it in the juvenile court. The People rely on numerous cases that hold a claim that a punishment is cruel and unusual is forfeited by the failure to object on that ground. The rationale of these cases is that the challenge is fact specific, requiring an "examination of the offense and the offender." (*People v. Norman* (2003) 109 Cal.App.4th 221, 229; see also *People v. Dejesus* (1995) 38 Cal.App.4th 1, 27 [application of *People v. Dillon* (1983) 34 Cal.3d 441 is fact specific].)

Here, J.C. mounts a facial challenge to the constitutionality of section 290.008, rather than a challenge to his individual sentence. As the People acknowledge in their briefing, J.C.'s challenge does not turn on the particular facts of his case, but instead is a pure question of law that can be resolved without reference to the specific facts of his case. We have discretion to decide a pure question of law based on undisputed facts raised for the first time on appeal. (*Hale v. Morgan* (1978) 22 Cal.3d 388, 394.) "[A]lthough California authorities on the point are not uniform, our courts have several times examined constitutional issues raised for the first time on appeal, especially when the enforcement of a penal statute is involved [citation], the asserted error fundamentally

5

affects the validity of the judgment [citation], or important issues of public policy are at issue [citation]." (*Ibid.*; see also *In re Sheena K.* (2007) 40 Cal.4th 875, 888 [juvenile did not forfeit her challenge to a probation condition on constitutional grounds by failing to raise the issue in the juvenile court because her facial constitutional challenge presented a clear question of law, easily correctable by an appellate court].)

Thus we will consider whether section 290.008, requiring lifetime sex offender registration in some cases based on offenses committed by juveniles, constitutes cruel and unusual punishment.[4]

B. *Registration Requirements for Juveniles*

Not all juveniles who commit sex offenses, even serious offenses, are required to register. Juvenile wards are required to register as sex offenders only "when they are discharged or paroled from [DJF] after having been committed for one of the enumerated offenses." (*In re Bernardino S.* (1992) 4 Cal.App.4th 613, 619-620.)

Section 290.008, subdivision (a) provides: "Any person who, on or after January 1, 1986, is discharged or paroled from the Department of Corrections and Rehabilitation to the custody of which he or she was committed after having been adjudicated a ward of the juvenile court pursuant to Section 602 of the Welfare and Institutions Code because of the commission or attempted commission of any offense described in subdivision (c) shall register in accordance with the Act." The offenses described in subdivision (c) include rape, sodomy, oral copulation, and lewd acts with a minor. (§ 290.008, subd. (c)(1).) The "Act" is the Sex Offender Registration Act, sections 290 to 290.024. (§ 290, subd. (a).)

---

[4] Because we reach the merits of this claim and all of J.C.'s claims, we do not address his alternate arguments that trial counsel was ineffective for failing to preserve his claims at the trial court level. He does not argue that counsel was ineffective for failing to establish that juvenile sex offenders do not pose the same risk of recidivism as adult offenders.

The Act requires certain persons to register for the rest of their lives with the city chief of police or the county sheriff where they reside, as well as the chief of police at a campus of the University of California, the California State University, or community college if such person resides on the campus.[5]  (§ 290, subd. (b).)  A person required to register must register annually within five days of his or her birthday, and upon a change of address.  (§ 290.012, subd. (a).)  The information required upon registration includes the name and address of the person's employer and the address of the person's place of employment, fingerprints and a current photograph, the license plate number of any vehicle owned by, registered to, or regularly used by the person, and in some cases a list of Internet identifiers used by the person.  (§ 290.012, subd. (a), 290.015, subd. (a)(1)-(4).)

In certain circumstances a juvenile may obtain relief from the registration requirement.  A person who has been adjudged a ward of the court may petition to have his or her juvenile records sealed. (Welf. & Inst. Code, § 781, subdivision (a).)  An order sealing juvenile records shall relieve the person of the registration requirement.  (*Id.,* subd. (a)(1)(C).)  It is not clear whether this relief is available to J.C.

C.  *Policy Challenges*

J.C. challenges the various rationales for sex offender registration, contending they do not apply to juveniles.  Citing several law review articles and studies, he asserts that juvenile sex offenders, unlike adults, have low rates of recidivism.  He contends this lower recidivism rate shows that juvenile sex offender registration is not rationally related to a nonpunitive purpose and lifetime registration is excessive because most juveniles

---

[5]  Until January 1, 1995, persons adjudicated guilty of sexual offenses as juveniles were required to register only until they turned 25.  Effective January 1, 1995, the restriction was abolished and a lifetime duty of registration was imposed on all such persons who were discharged or paroled from juvenile commitments on or after January 1, 1986.  (*People v. Allen* (1999) 76 Cal.App.4th 999, 1001; § 290, Stats. 1994, ch. 863, § 1.)

7

will not re-offend.  J.C. further contends that juvenile registration does not promote public safety, but may actually impede it by limiting the juvenile's opportunities to pursue a normal life and engage in the community.

These policy arguments, although certainly intriguing, are properly addressed to the Legislature.  "Courts do not sit as super-legislatures to determine the wisdom, desirability or propriety of statutes enacted by the Legislature."  (*Estate of Horman* (1971) 5 Cal.3d 62, 77.)  "In reviewing the constitutionality of legislation, it must be remembered that '[c]ourts have nothing to do with the wisdom of laws . . . , and the legislative power must be upheld unless manifestly abused so as to infringe on constitutional guaranties. . . .  The only function of the courts is to determine whether the exercise of legislative power has exceeded constitutional limitations.'  [Citations.]"  (*Professional Engineers v. Department of Transportation* (1997) 15 Cal.4th 543, 593.)

Further, J.C. has not established that juvenile offenders have lower recidivism rates.  His own record of multiple offenses is not particularly supportive of this claim.  The general issue of recidivism rates for juveniles was not raised in the trial court, and the People did not address it in their briefing, much less stipulate to any record of undisputed facts that would provide us with sufficient foundation to decide the issue in the first instance.

At oral argument, the deputy attorney general remarked that social science studies show the general recidivism rate of juvenile sex offenders is low, while arguing that J.C. is a dangerous predator and recidivist, as shown by his own criminal history.  This casual reference to unspecified studies does not provide us with an adequate factual foundation to address J.C.'s argument that minors have different recidivism rates than adults.  Absent the necessary factual record, we cannot find J.C.'s assertion on this factual issue is

8

undisputed. The appellate court is not the proper place to lay the factual foundation for an argument.**6**

      D. *Registration as Punishment*

A necessary predicate to a finding of cruel and unusual punishment is that juvenile sex offender registration is punishment. (See *In re Alva* (2004) 33 Cal.4th 254, 260 (*Alva*).) J.C. has failed to establish this necessary predicate.

      1. *Case Law*

Both the United States Supreme Court and our Supreme Court have held that mandatory lifetime sex registration is not cruel and unusual punishment. The high courts have not confined these rulings to adults, but instead have spoken without regard to the age of the registrant. Because the record in this case does not compel a conclusion that minors necessarily have recidivism rates lower than adults, or that any difference in rates would undermine the legislative findings supporting lifelong registration, we are not persuaded this clear and controlling precedent can be deemed inapplicable to minors.

In *Smith v. Doe* (2003) 538 U.S. 84 [155 L.Ed.2d 164] (*Smith*), the United States Supreme Court held retroactive application of the Alaska Sex Offender Registration Act (SORA) did not violate the ex post facto clause. SORA required a sex offender to

---

**6** We note that the Pennsylvania Supreme Court has held the presumption of recidivism by juvenile sex offenders in Pennsylvania's sex offender registration law violated the juvenile offenders' due process rights. (*In the Interest of J.B.* (Pa. 2014) 107 A.3d 1, 20.) The court found the presumption "that sexual offenders pose a high risk of recidivating is not universally true when applied to juvenile offenders." (*Id.* at p. 17.) The court relied on research presented by experts on a stipulated record. While the Commonwealth did not necessarily accept the research presented, it neither provided a substantive critique of the research nor produced contrary empirical evidence. (*Id.* at p. 10 & fn. 16.) Here, in contrast, we have no stipulated record or even a definitive concession. Further, J.C.'s argument is that mandatory juvenile sex offender registration is cruel and unusual punishment, not that it unconstitutionally created an irrebuttable presumption in violation of the due process clause. The Pennsylvania case is not on point to J.C.'s arguments.

register with law enforcement authorities and made public much of the registration information. (*Id.* at p. 89.) The court looked first to the intent of the Alaska Legislature and found the intent was "to create a civil, nonpunitive regime." (*Id.* at p. 96.) The court looked next to the effects of SORA and whether they were so punitive as to negate the intent. (*Id.* at p. 92.) In analyzing the effects, the court referred to the seven-factor test of *Kennedy v. Mendoza-Martinez* (1963) 372 U.S. 144, 168-169 [9 L.Ed.2d 644] (*Mendoza-Martinez*). (*Smith,* at p. 97.)

The *Smith* court found the "most relevant" of the *Mendoza-Martinez* factors to be "whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." (*Smith, supra,* 538 U.S. at p. 97.) It found sex registration laws did not resemble colonial punishments designed to inflict public disgrace. There was no infliction of physical pain or direct confrontation between offender and the public. (*Id.* at p. 98.) "[T]he stigma of Alaska's Megan's Law results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public. Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment." (*Ibid.*)

SORA imposed no physical restraint and its obligations were less than occupational disbarment which had been held to be nonpunitive. (*Smith, supra,* 538 U.S. at p. 100.) "Although the public availability of the information may have a lasting and painful impact on the convicted sex offender, these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record." (*Id.* at p. 101.) That SORA might deter future crime was insufficient to show it was punitive. " 'To hold that the mere presence of a deterrent

10

purpose renders such sanctions "criminal" . . . would severely undermine the Government's ability to engage in effective regulation.' [Citations.]" (*Id.* at p. 102.)

The *Smith* court found SORA's rational connection to a nonpunitive purpose to be the " 'most significant factor' " in determining its effects were not punitive. (*Smith, supra,* 538 U.S. at p. 102.) SORA had a legitimate, nonpunitive purpose of public safety, advanced by alerting the public to risk of sex offenders in their community. (*Id.* at pp. 102-103.) In this regard, it was not necessary that SORA be narrowly drawn to accomplish its purpose; a categorical judgment based on the conclusion "that a conviction for a sex offense provides evidence of substantial risk of recidivism" was sufficient. (*Id.* at p. 103.) The duration of the reporting requirements was not excessive given empirical research that offenders may reoffend many years after release.[7] (*Id.* at p. 104.)

In *Alva, supra,* 33 Cal.4th at page 262, the unanimous California Supreme Court held the *mere registration* of sex offenders under section 290 was not a punitive measure subject to the proscription against cruel and/or unusual punishment. The opinion did not address public disclosure of registration information because those provisions were not applicable to Alva. (*Id.* at p. 268, fn. 9.) Following *Smith*, as well as *Kansas v. Hendricks* (1997) 521 U.S. 346 [involuntary confinement of certain dangerously

---

[7] Unlike California's sex registration laws, the Alaska law was tiered. If the offender was convicted of a single, nonaggravated sex crime, he was required to register annually for 15 years. If he was convicted of an aggravated sex offense or of two or more sex offenses, he was required to register for life and verify the information quarterly. (*Smith, supra,* 538 U.S. at p. 90.) We note the California Sex Offender Management Board has *continuously* recommended that California restructure its sex offender registry into three risk-based tiers, eliminating lifetime registration for low-risk offenders who cooperate and remain offense-free for 10 to 20 years, allowing law enforcement to concentrate its efforts on high risk offenders. (Cal. Sex Offenders Management Bd., Year End Report 2015 (Feb. 2016) p. 1.) In response to this recommendation, there is pending legislation to adopt a three-tier sex offender registry California. (Sen. Bill No. 421 (2017-2018 Reg. Sess.).)

disordered recidivist sex offenders beyond their prison terms was not punishment for double jeopardy or ex post facto purposes] and *People v. Castellanos* (1999) 21 Cal.4th 785 [sex offender registration not punishment under ex post facto clause], the court found "[b]eyond doubt" that sex offender registration was not punishment, but a legitimate, nonpunitive regulatory measure. (*Alva,* at pp. 279-280.) "Given the general danger of recidivism presented by those convicted of criminal sexual misconduct, and the relatively minor burden registration represents, the Legislature may adopt a rule of general application for this class of offenders, and may guard against the demonstrated long-term risk of reoffense by imposing a permanent obligation on persons convicted of such crimes." (*Ibid.*)

The *Alva* court next considered whether sex offender registration might be punishment under a "broader" test applicable to the cruel and/or unusual punishment clauses of the state and federal constitutions and concluded the answer was no. (*Alva, supra,* 33 Cal.4th at p. 280.) "To qualify, the burden or disability must be imposed as a consequence of a law violation, and must either be intended as punishment, or have no other legitimate aim. Measures imposed within the legislative power, that were intended as civil and nonpunitive and had a legitimate regulatory purpose, were not deemed punishment for this purpose, even if they had substantial—even harsh and severe—penal consequences. By these standards, for the reasons set forth above, the mandatory registration of convicted sex offenders is not punishment." (*Id.* at p. 282.)

Further, the *Alva* court considered whether sex offender registration, although civil in nature, was nonetheless punishment under *Austin v. United States* (1993) 509 U.S. 602 [125 L.Ed.2d 488], a civil forfeiture case. (*Alva, supra,* 33 Cal.4th at p. 286.) Under the *Austin* test, " ' "[A] civil sanction that cannot fairly be said *solely to serve a remedial purpose*, but rather can *only be explained* as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." [Citation.]' [Citations.]" (*Id.* at p. 283.) Again, the *Alva* court found sex offender registration was

not punishment. (*Id.* at p. 290.) Sex offender registration laws are "intended to assist law enforcement to maintain surveillance of recidivist sex offenders, and have no purpose to punish for past misconduct." (*Id.* at p. 287.) The court again relied on the " ' "frightening and high" ' " danger of recidivism and the need for "regulatory leeway to deal with the serious problem of recidivist sex offenses." (*Id*. at p. 289.)

This is the current state of the law. Broadly speaking, mandatory lifetime sex offender registration is not punishment. However, because the cases do not mention the age of the offender as a factor in the analysis,[8] we turn to J.C.'s attempts to distinguish *Smith* and *Alva* based on his juvenile status at the time of his offense.

### 2. *Public Disclosure of Juvenile Information*

J.C. contends *Smith* and *Alva,* holding that mandatory sex offender registration is not punishment, are not dispositive because they concern adult sex offender registration and juveniles are different from adults. Under the two-part "intent-effects" test of *Mendoza-Martinez*, J.C. concedes the intent of section 290.008 is regulatory, not punitive. He argues, however, that the *effect* of the law, when applied to juveniles, is punitive.

J.C. focuses on the public disclosure aspects of juvenile sex offender registration and argues disclosure has a greater impact on juveniles because juvenile records are usually confidential rather than public as are adult records.[9] In *Smith,* the United States Supreme Court rejected the argument that sex offender registration resembled the historic

---

[8] The following colloquy occurred at oral argument: [The Court]: "So, we're not bound by *Smith* and *Alva* on this question?" [The Deputy Attorney General]: "Right." We construe the Attorney General's response to take the position that *Smith* and *Alva* are not dispositive in and of themselves on the question of the nature of mandatory lifetime sex offender registration for *juvenile* offenders.

[9] The People inexplicably fail to respond to this argument. Instead, they address the residence restrictions for registered sex offenders, although J.C. does not.

punishment of shaming.  (*Smith, supra,* 538 U.S. at p. 98 ["the stigma of Alaska's Megan's Law results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public"].)  The court next found no affirmative disability or restraint, noting any painful impact was due to the conviction, a public record, not the Act's registration and dissemination requirements.  (*Id.* at p. 101.)

J.C. argues mandatory lifetime registration for juvenile sex offenders does impose an affirmative disability or restraint because it "mandates the public dissemination of information that would otherwise be confidential."  We consider the extent to which registration under 290.008 requires public disclosure of the registration information.

First, we recognize that juvenile court records are generally confidential, "but not absolutely so."  (*In re Keisha T.* (1995) 38 Cal.App.4th 220, 231.)  Welfare and Institutions Code section 827, subdivision (a) lists the persons who may inspect juvenile court records, including "[a]ny other person who may be designated by court order of the judge of the juvenile court upon filing a petition."  (*Id.*, subd. (a)(1)(P).)

J.C. contends that law enforcement may provide information about a registered sex offender to the public "when necessary to ensure the public safety."  (§ 290.45, subd. (a)(1).)  First, we note that it is questionable whether section 290.45 even applies to juveniles, because by its terms it applies only to "a person required to register as a sex offender pursuant to Section 290."  (§ 290.45, subd. (a)(1).)  Here, we are addressing registration pursuant to section 290.008, not section 290.  Although we recognize that sex offender registration based on juvenile offenses was contained in section 290 prior to the enactment of section 290.008 (former § 290, subd. (d), Stats. 1987, ch. 753, § 3), section 290.45 has been amended since section 290.008 was enacted in 2007, most recently last year (Stats. 2016, ch. 772, § 8), but its language has not been changed to include registration pursuant to section 290.008.  In contrast, other provisions enacted or amended after 2007 refer to persons required to register "pursuant to the Act"

14

(§§ 290.006, 290.011, 290.014, 290.017, 290.020, 290.024), "pursuant to any provision of the Act" (§ 290.007), "under the Act" (§§ 290.009, 290.016, 290.018), or "pursuant to Sections 290 to 290.009, inclusive" (§ 290.01).

Even assuming that section 290.45 applies to juveniles, it is similar to Welfare and Institutions Code section 827.7, subdivision (b), which permits a court to authorize a sheriff who receives information about a minor who has committed a felony to disclose that information, "where the release of the information is imperative for the protection of the public and the offense is a violent felony." The additional burden, if any, imposed by section 290.45 and beyond those burdens already imposed by the Welfare and Institutions Code, is insufficient to make section 290.008 punitive.

J.C. argues his identifying information "could be" published on the Megan's Law website (§ 290.46), however he fails to show that the Megan's Law website (containing of information about registered sex offenders) applies to juvenile offenders. Section 290.46 speaks only of those who have "been convicted" of certain offenses. (§ 290.46, subds. (b)(1), (c)(1), (d)(1), (e)(1), (f).) Registration pursuant to section 290.008 applies only to those "adjudicated a ward of the juvenile court," not to those convicted of crimes. The Attorney General's office has interpreted the law *not* to apply to juveniles, stating on the Megan's Law website: "By law, juveniles are not displayed on the Megan's Law website." (Cal. Atty. Gen., Cal. Megan's Law Web site <www.meganslaw.ca.gaov/SexOffenders_Risk Assessment.aspx> [as of Jul. 31, 2017].)

J.C. recognizes these points but argues "there remains a risk that the Attorney General will change its policy and juvenile offenders like J.C. would be included on the Megan's Law website." J.C. cannot prevail in his facial challenge to section 290.008 "by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute." (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180.) Rather, he "must demonstrate that the [statute's]

15

provisions inevitably pose a present total and fatal conflict with applicable constitutional prohibitions." (*Id.* at pp. 180-181.)

There are disclosure requirements that expressly apply to juvenile offenders. Anyone required to register pursuant to section 290 to 290.009 inclusive, thus including a juvenile offender, must register with the campus police at any university, college, community college, or other institution of higher learning where he or she is a student or employee. (§ 290.01(a)(1).) In addition, certain identifying information, not available to the public on the Megan's Law website, may be released to the members of the campus community. (*Id.,* subd. (d)(1)(A).) Law enforcement is immune from civil or criminal liability for good faith conduct under this provision. (*Id.*, subd. (d)(2).) There is, however, some protection for the sex offender's privacy, provided by a restriction on dissemination of the information that stresses the regulatory nature of registration and reduces the punitive effect of disclosure. One requesting the information must sign a statement that he or she "understands the purpose of the release of information is to allow members of the campus community to protect themselves and their children from sex offenders, and that he or she understands it is unlawful to use information obtained pursuant to this subdivision to commit a crime against any registrant or to engage in illegal discrimination or harassment of any registrant." (*Id.*, subd. (d)(4)(A).)

J.C. also objects to the breadth of the disclosure required of juveniles, contending it includes private information such as Internet identifiers. J.C. misstates the scope of this requirement. It is true that registered sex offenders *may* be required to provide a list of all Internet identifiers. (§ 290.015, subd. (a)(4).) This provision, however, is limited in scope and applies only to those convicted of a felony on or after January 1, 2017, and only if a court determines the person used the Internet in the commission of the crime. (§ 290.024, subd. (a).) Because, as we have explained, section 290.008 does not apply to those *convicted* of felonies, this disclosure provision does not apply.

J.C. has failed to show the limited degree of public disclosure applicable to juveniles required to register pursuant to section 290.008 is sufficiently burdensome to distinguish it from that applicable to adult offenders. Without such distinguishing features, the public disclosure aspects of juvenile sex offender registration fail to render such registration a punitive affirmative disability or restraint that it constitutes punishment.

### 3. *The Differences between Juveniles and Adults*

As to the remaining *Mendoza-Martinez* factors applied to identify punishment, J.C. contends the analysis must be different than that in *Smith* or *Alva* because section 290.008 fails to distinguish between adult and juvenile offenders as required by recent United States Supreme Court jurisprudence. J.C. relies on four United States Supreme Court decisions.

In *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1], the court adopted a categorical rule barring imposition of the death penalty on any offender under the age of 18 years. The court reasoned that three differences between juveniles and adults established that juveniles cannot be classified as among the worst offenders. (*Id*. at pp. 569-570.) These differences were (1) the juvenile's lack of maturity and underdeveloped sense of responsibility; (2) his or her greater vulnerability and susceptibility to negative influences and outside pressures, including peer pressure; and (3) that the juvenile's character was not as "well formed" as an adult's and his or her personality traits were "more transitory, less fixed." (*Id.* at pp. 569-570.)

In *Graham v. Florida* (2010) 560 U.S. 48, 74 [176 L.Ed.2d 825, 845], the court held a sentence of life without parole for a juvenile offender who did not commit homicide violated the Eighth Amendment. If a state imposes a sentence of life on a juvenile offender, "it must provide him or her with some realistic opportunity to obtain release before the end of that term." (*Id*. at p. 82.) In rejecting the harsher punishment for juveniles, the court emphasized the characteristics of youth, identified in *Roper,* that

17

make juveniles less culpable and less susceptible to deterrence than adults. (*Id.* at pp. 68-72.)

In *J.D.B. v. North Carolina* (2011) 564 U.S. 261 [180 L.Ed.2d 310] (*J.D.B.*), the court required consideration of youth outside the sentencing context. It held a juvenile's age must be considered in determining whether he or she was in custody for purposes of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694]. "It is beyond dispute that children will often feel bound to submit to police questioning when an adult in the same circumstances would feel free to leave. Seeing no reason for police officers or courts to blind themselves to that commonsense reality, we hold that a child's age properly informs the *Miranda* custody analysis." (*J.D.B.,* at pp. 264-265.)

In *Miller v. Alabama* (2012) 567 U.S. 460 [183 L.Ed.2d 407], the court considered mandatory sentences of life without the possibility of parole for juveniles. It held "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments' " because it "runs afoul of our cases' requirement of individualized sentencing for defendants facing the most serious penalties." (*Id.* at p. 465.) The court again relied on the three significant differences between children and adults, stating "*Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing." (*Id.* at p. 471.)

J.C. argues the recognition that children are different from adults, and that such differences must be considered when determining the harshness of sentencing, must apply equally to sex offender registration for juveniles. He argues that such consideration must result in barring lifetime juvenile sex offender registration. Although J.C. cites to *In re C.P.* (Ohio 2012) 967 N.E.2d 729, in which the Ohio Supreme Court struck down automatic juvenile sex offender registration on due process and cruel and unusual punishment grounds, that case does not aid J.C. in establishing that juvenile sex offender registration is punishment. In *In re C.P.*, the Ohio Supreme Court had *previously*

18

determined "that the enhanced sex-offender reporting and notification requirements contained in R.C. Chapter 2950 [ ] are punitive in nature, making their retroactive application unconstitutional." (*Id.* at p. 734.)  Thus, *In re C.P.* did not decide the issue before us, whether juvenile sex offender registration is punishment.

To the extent J.C. is using the "children are different" analysis to determine whether mandatory lifetime sex offender registration for juveniles is punishment, his argument is circular.  He appears to recognize that he cannot use the so-called *Miller* factors, applicable to harsh sentencing that is indisputably punishment, to *establish* that juvenile sex offender registration is punishment.  But unless he first establishes that registration is punishment, this line of cases does not even arguably apply to him.  *Roper, Graham*, and *Miller* rely on the significant differences between children and adults in imposing the harshest punishments.  "At the core of *Miller's* rationale is the proposition—articulated in *Roper*, amplified in *Graham*, and further elaborated in *Miller* itself—that constitutionally significant differences between children and adults 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' [Citation.]  The high court said in plain terms that because of 'children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.'  [Citation.] 'That is especially so because of the great difficulty . . . of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption."  [Citations.]' [Citation.]"  (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1379.)  That children are less culpable and more capable of change than adults is relevant in determining whether the *harshest* punishment is appropriate, but it does not establish that sex offender registration is punishment, let alone that it is one of the harshest.

Moreover, the distinctive "attributes of youth" (*Miller v. Alabama, supra,* 567 U.S. 461) of the particular minor are considered by the juvenile court long before the

point where mandatory lifetime sex offender registration is reached.  Indeed, recognition that "children are different" is the underpinning of the juvenile court system.  The juvenile court system's primary purpose is different than that of adult criminal law.  (*In re Charles C.* (1991) 232 Cal.App.3d 952, 960.)

The purpose of juvenile court law is to protect both the public and the minor "and to preserve and strengthen the minor's family ties whenever possible."  (Welf. & Inst. Code, § 202, subd. (a).)  A minor must receive "care, treatment and guidance" consistent with the best interest of both the minor and the public and, for minors who commit crimes, the disposition must hold them "accountable for their behavior," be appropriate for the circumstances, and conform with rehabilitative objectives and the interest of public safety and protection.  (*Id.*, subd. (b).)  In engaging in its deliberations, the court must consider public safety, victim redress, and the best interests of the minor.  (*Id.,* subd. (d).)

"When determining the proper disposition for a minor who has been found to be a delinquent, the court must consider (1) the minor's age, (2) the circumstances and gravity of the offense, and (3) the minor's previous delinquent history.  [Citations.]  Additionally, there must be evidence in the record demonstrating both a probable benefit to the minor by a [DJF] commitment and the inappropriateness or ineffectiveness of less restrictive alternatives.  [Citation.]  In fact, no ward of the juvenile court shall be committed to the DJF unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable he will be benefited by the reformatory educational discipline or other treatment provided by DJF.  [Citations.]"[10] (*In re Joseph H.* (2015) 237 Cal.App.4th 517, 542.)

_____

[10]  To the extent that J.C. argues that *J.D.B., supra,* 564 U.S. 261 shows that the attributes of youth apply outside the sentencing context, *J.D.B.* requires only consideration of the minor's age.

Thus, at every step of his various placements--from his mother's home, to Martin's Achievement Place, to Lakeside Academy, and finally to DJF (the placement that triggered the registration requirement)--the court has considered J.C.'s "attributes of youth." Unlike adults, juveniles are not required to register simply because they committed certain crimes. J.C. has failed to show that because "children are different," juvenile sex offender registration is punishment.

Because J.C. has failed to establish that juvenile sex offender registration is punishment, his claim that registration is cruel and unusual punishment must fail.

II

*Failure to Use Age-Appropriate Risk Assessment Tool*

A. *Background*

After the juvenile court committed J.C. to DJF, a representative of DJF wrote the court about compliance with Welfare and Institutions Code section 706. That statute requires a risk assessment using the selected SARATSO (State-Authorized Risk Assessment Tool for Sex Offenders) if the probation officer has recommended the minor be transferred to DJF. (Welf. & Inst. Code, § 706.)

The juvenile court ordered Dr. Weber to administer the risk assessment tool JSORRAT-II, an actuarial measure of risk for juvenile sexual offense recidivism.[11] J.C. scored an 11 on the JSORRAT-II which placed him in the category of a moderate to high risk to reoffend. His risk factors were based on the length of his sexual offending history, the number of victims, that he was on probation, his sex offender treatment failure, his placement in special education, and the number of educational discipline problems. The court found JSORRAT-II to be the appropriate risk assessment tool, even though J.C. was now 18. The court ordered DJF to continue processing J.C.

_____

[11] Dr. Weber said the risk assessment tool had been shown to be a "moderate predictor of juvenile sexual re-offense potential."

B. *Analysis*

J.C. contends the juvenile court erred by committing him to DJF without first ordering a risk assessment, as required by Welfare and Institutions Code section 706. He contends the court then compounded the error by ordering J.C. to be assessed with a risk assessment tool (JSORRAT-II) designed for those *under* age 18 although J.C. was then 18. J.C. argues these errors require reversal of the disposition order.

As to the first error--committing J.C. to DJF without obtaining a risk assessment-- the juvenile court corrected the error by obtaining a risk assessment and then ordering DJF to proceed with the placement. Thus, we focus on the second alleged error--use of an inappropriate risk assessment tool.

The selection of the appropriate risk assessment tool for sex offenders is entrusted to the SARATSO Review Committee. (§ 290.04.) The Committee has selected the Static-99R for adults and the JSORRAT-II for male juveniles. The People concede the wrong risk assessment tool was used; because J.C. was 18, the proper tool to evaluate him was the tool used to evaluate adults. The People contend, however, that the error was harmless because the court would have committed J.C. to DJF regardless of which risk assessment tool was used. The People argue commitment to DJF was inevitable because no suitable less restrictive placement was available.

While we do not question the People's analysis of the appropriateness of DJF placement, the People ignore the other proper uses of a risk assessment. As J.C. details, the California SARATSO Review and Training Committee has set forth the four main uses for risk assessment scores: (1) sentencing; (2) by law enforcement in making a decision whether a registered sex offender poses a current risk to the public such that public notification is appropriate; (3) to determine whether a registered sex offender must be supervised on a high risk case load while on probation or parole; and (4) in

determining placement in a sex offender treatment program.[12] (Cal. SARATSO Review and Training Committees, Sex Offender Risk Assessment in California (Jan. 3, 2017) p. 5.)

Because J.C.'s risk assessment score may be used subsequent to his commitment to DJF, the score should be determined by using the proper age-appropriate risk assessment tool to ensure that it is as accurate as possible. Accordingly, we reverse and remand the dispositional order to provide for J.C.'s assessment using the age-appropriate risk assessment tool.

### III

### *Maximum Term of Confinement*

"A ward committed to the Division of Juvenile Facilities may not be held in physical confinement for a period of time in excess of the maximum period of imprisonment that could be imposed upon an adult convicted of the offense or offenses that brought or continued the minor under the jurisdiction of the juvenile court." (Welf. & Inst. Code, § 731, subd. (c).) On the date of J.C.'s offense, September 13, 2009, the maximum sentence for a violation of section 288, subdivision (b) was eight years. (Former section 288, subd. (b)(1), Stats. 2004, ch. 823, § 7.) When the wardship petition was sustained, the court advised J.C. the maximum period of confinement was eight years.

In 2010, the Legislature enacted the Chelsea King Child Predator Prevention Act of 2010. (Stats. 2010, ch. 219, § 1.) One provision of this act increased the punishment for a violation of section 288, subdivision (b) to a maximum of 10 years. (Stats. 2010, ch. 219, § 7.) The probation report, prepared in 2015 in connection with J.C.'s alleged violation of probation while at Lakeside Academy, calculated his maximum term of

---

[12] The People unhelpfully fail to address these proper uses of the risk assessment score.

confinement as 10 years.  The dispositional order stated the maximum term of confinement was 10 years.

J.C. contends increasing his maximum term of confinement from 8 to 10 years violated the ex post facto clause of both the state and federal constitutions.  The People concede the error and agree the dispositional order should be modified to show a maximum term of confinement of eight years.  We agree with the parties and direct the juvenile court to correct the error on remand.

## DISPOSITION

The dispositional order is reversed and the matter is remanded to the juvenile court with directions to request the age-appropriate SARATSO risk assessment for J.C.  Upon receipt of the results of the risk assessment test, the court shall hold a new disposition hearing and enter a new dispositional order as it deems appropriate.  The new dispositional order shall state the maximum term of confinement is eight years.


　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　Duarte, J.



We concur:



　　/s/
Butz, Acting P. J.



　　/s/
Renner, J.

24