Filed 7/9/21  In re James L. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re JAMES L., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAMES L.,<br><br>        Defendant and Appellant. | A161240<br><br>(Contra Costa County<br>Super. Ct. No. J17-01010) |

After appellant admitted violations of juvenile probation, the court committed him to the Division of Juvenile Justice (DJJ).[1]  Appellant contends the juvenile court abused its discretion in committing him to the DJJ because the evidence was insufficient to establish probable benefit to him from a DJJ commitment or that less restrictive placement would be inappropriate.  We disagree and affirm.

---

[1] " 'The California Youth Authority (CYA) was renamed California's Department of Corrections and Rehabilitation, Division of Juvenile Justice, effective July 1, 2005.  The Division of Juvenile Facilities (DJF) is part of the Division of Juvenile Justice.' [Citation.]  The trial court (and many cases) use DJJ (Division of Juvenile Justice) and DJF seemingly interchangeably." (*In re J.C.* (2017) 13 Cal.App.5th 1201, 1204, fn. 2.)  In the instant matter, we refer to the division as DJJ.

# I.  FACTUAL AND PROCEDURAL BACKGROUND

## A.  Original 2017 Adjudication

On September 24, 2017, at a Contra Costa County middle school, appellant James L. and another male surrounded the 13-year-old victim.  The other male punched the victim twice in the back of his head, and appellant ordered the victim to give up his belongings.  Fearing for his safety, the victim took off his Gucci belt and handed it over to appellant, who gave it to his cohort.  After appellant told the victim to take off his True Religion pants, he did so and handed them to appellant.  Appellant and the other male left with the victim's property.  The belt and pants were worth $650.

On September 27, 2017, the Contra Costa County District Attorney filed a juvenile wardship petition (Welf. & Inst. Code,[2] § 602, subd. (a)) alleging appellant, age 14, committed second degree robbery (Pen. Code., §§ 211, 212.5, subd. (c)).

Slightly over a week later, appellant admitted to an amended count of grand theft person.  (Pen. Code, § 487, subd. (c).)  The court dismissed the robbery count.  Appellant was adjudged a ward of the court, placed on probation, and ordered to reside with his mother on home supervision for 60 days.

## B.  January 2018 Probation Violation

In January 2018, the probation department filed a notice of probation violation hearing, pursuant to section 777, alleging appellant violated the terms of his probation by violating his nighttime curfew, and consequently, his mother was unaware of his whereabouts.  A warrant for his arrest issued.  Appellant was arrested at his grandmother's residence.  Shortly thereafter,

---

[2] Further undesignated statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

appellant admitted the probation violation. The court continued him as a ward of the court but permitted him to remain in his mother's care for a 90-day period of home supervision.

## C. *March 2018 Probation Violation*

A violation of probation was filed in March 2018, because appellant removed his ankle monitor and his whereabouts were unknown. A warrant issued. The violation of probation was dismissed in March 2019.

## D. *2019 Supplemental Petition*[3]

On November 5, 2018, while the victim was walking with his girlfriend in front of Burger King, he was attacked by appellant and two others. As they approached, appellant demanded the victim's backpack. When the victim refused, he was pushed into oncoming traffic where the assailants punched him in the back of his head and in his face multiple times. The victim was knocked to the ground where he was punched several more times in the head. While the victim was still on the ground, appellant jumped off a retaining wall, landing with both feet on the victim's head. Appellant and his accomplices then fled to a vehicle and left the area.

In January 2019, a supplemental section 602 petition was filed alleging that on November 5, 2018, appellant committed an assault by force likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4); count one) and robbery (*id.*, §§ 211, 212.5, subd. (c); count two)). The petition was amended, and on March 19, 2019, appellant admitted second degree robbery (*id.*, §§ 211, 212.5; count two), felony grand theft (*id.*, § 487, subd. (c); count three), and misdemeanor assault with force likely to produce great bodily injury (*id.*, § 245, subd. (a)(4); count four).

---

[3] We take the facts from the probation report prepared for the April 3, 2019 hearing.

At the dispositional hearing, the juvenile court committed appellant to the Youthful Offender Treatment Program (YOTP). In January 2020, appellant successfully completed the in-custody part of the YOTP and was placed on 90-day home supervision.

### E. April and July 2020 Probation Violations

On April 20, 2020, the probation department filed a notice of probation violation alleging appellant left his residence without permission, used alcohol, failed to adhere to curfew, was photographed holding a black firearm with an extended magazine, and associated with a person not approved by the probation officer. A warrant for appellant's arrest was issued, and he was taken into custody on July 16, 2020.

On June 9, 2020, according to a sheriff's department report, appellant told a law enforcement officer's 14-year-old daughter that he was in danger and needed her father's firearm. She obtained a black Glock 27 semiautomatic pistol and gave it to appellant. On July 20, the probation department filed a second notice of probation violation alleging appellant stole a Glock firearm belonging to a law enforcement officer.

On August 5, 2020, the April probation violation was amended, and all allegations were stricken except the allegation that appellant left home without permission and his whereabouts were unknown. That same date, the July 2020 violation of probation was amended to allege that according to a Contra Costa County Sheriff's Department report, appellant failed to obey all laws by being in possession of a Glock 27 firearm on June 9, 2020. As amended, appellant admitted the two violations of probation.

## F. Dispositional Hearing

A contested dispositional hearing took place in early October 2020. The juvenile court committed appellant to the DJJ for a maximum term of 6 years 131 days, with credit for 460 days served.

## II. DISCUSSION

Appellant claims the juvenile court abused its discretion in committing him to the DJJ because there was insubstantial evidence that he would benefit from the programs at the DJJ or that less restrictive alternative placements were inadequate. We are unpersuaded.

## A. The Disposition

### 1. The Disposition Report

In preparation for the contested dispositional hearing, the probation officer wrote a disposition report recommending appellant be committed to the DJJ because " 'after reviewing the circumstances of the recent probation violations, his prior history and considering treatment options, it has been determined this youth is not acceptable for the YOTP.' " The probation officer went on to explain appellant had " 'shown himself to be quite sophisticated, and dangerous, with the planning of and stealing an officer's firearm as well as possessing and shooting firearms in a random location in the dark.' " The probation officer also pointed to appellant's " 'obvious and proud' " membership in a gang that " 'encourages substance use, criminal activity and the use of dangerous and deadly weapons, as chronicled by [appellant's] social media.' " The report noted appellant had " 'several chances to right his wrongs and correct his behavior by utilizing the skills and tools he learned in the YOPT (from April 2019 through January 2020), but he instead went right back to his criminal patterns and anti-social peers.' "

The report detailed appellant's numerous crimes and repeated probation violations, most of which we have described above. Due to appellant's recent completion of the in-custody portion of the YOTP and his subsequent behavior upon release, probation did not screen him for the YOTP. As noted in the report, appellant "failed to embrace the treatment he received at the YOTP and made minimal efforts to be compliant of the Court's orders, in addition to committing new crimes that put the community at risk of harm." For these reasons, the probation officer recommended appellant be committed to the DDJ "to have his violent tendencies, lack of cognitive reasoning and pro-social behavior, substance abuse, and gang affiliation issues addressed."

In the disposition report, the probation officer described the benefits of the DJJ. In addition to treatment programs designed to address his "criminogenic needs," appellant "would benefit from completing high school and participating in the DJJ Career Technical Education" in which he could have access to programs such as certifications in landscape design, principles and practices, irrigation design, forklift and equipment safety, horticultural science, computers and related technology, as well as completing college courses through which he could earn his associates of arts degree. Appellant could take advantage of "extensive mental health resources" and be provided with the opportunity to participate in "extensive rehabilitative therapy." Before being released, appellant would prepare a detailed transition plan to facilitate his successful community reintegration.

In sum, the probation officer concluded that based on appellant's "escalating pattern of crime and non-compliance," it was in the appellant's best interests, and the community's, to have him committed to "a secure facility like DJJ" while he received rehabilitative treatment.

## 2. *The Contested Dispositional Hearing*

At the commencement of the dispositional hearing, the court stated it had reviewed the disposition report, and received a defense-proffered social worker's memorandum screening appellant for a second placement in the YOTP, a social history, and letters of support. Other than the reports, neither the prosecutor nor the probation officer presented any further evidence.

Appellant, however, presented two witnesses. As the first witness, appellant's counsel called the author of the disposition report recommending appellant's commitment to the DJJ, Deputy Probation Officer Brian Horace from the East County YOTP. Horace testified appellant successfully completed the three institutional phases of the YOTP, after which he was placed on phase 4, the home supervision portion of the fourth phase.[4] Horace supervised appellant on home supervision and testified about two incidents of appellant's noncompliance occurring during the home supervision portion of phase 4. First, appellant wore an ankle monitor which allowed Horace to track appellant's whereabouts daily. However, on February 21, 2020, Horace had to admonish appellant after he asked for permission to go to dinner with his father, but instead "went with a group of his peers." Second, on April 6, 2020, "local authorities" showed Horace an image of appellant with a firearm. Pending notification to appear in court for a probation violation, appellant was not taken into custody because of the COVID-19 pandemic. Appellant absconded, however, before probation was able to bring him to court. Eventually, he was taken into custody. At juvenile hall, appellant did not

---

[4] Phase 4 is divided into two parts, home supervision followed by nonhome supervision.

initially do "so well," but during the last 6 weeks out of 11, he was "doing well."

In determining the DJJ was the appropriate placement for appellant, Horace considered appellant's monitor violations, that multiple agencies had contacted him with at least 50 images of appellant with weapons, and upon obtaining appellant's cell phone, "the level of activity showed that it was much more than just a simple violation." On the cell phone, Horace observed images of appellant having sex with "young ladies that are not clothed" and videos of appellant firing a gun. In addition, gang activity had been a "constant theme" throughout the time Horace had supervised appellant, who showed "an unwillingness to change the pattern." Horace testified the frequency of antisocial behavior was so high it was difficult to find a solution. Horace also took into account appellant's theft of a deputy sheriff's firearm by having the deputy's daughter steal the gun for him, asking the same girl to have sex with others for money, threatening, while in juvenile hall, to " 'smoke' " (kill) to another minor, and appearing in a gang-related video. According to Horace, appellant had been on home supervision multiple times and cut off his ankle monitor at least once, absconding for several months prior to his entering the YOTP.

Although Horace did not initially screen appellant for entry into the YOPT, defense counsel sought an order from the court to have appellant screened for another placement in the program. The probation department screened him the day before the hearing.

With respect to remediating appellant back to the YOTP, Horace explained appellant would be repeating the same program, and even though he had completed the in-custody portion of the program, he subsequently escalated his behavior in a negative way and continued to commit crimes.

8

Appellant's second witness was Probation Officer Greg Quesada, the institutional supervisor at the YOTP. Quesada was familiar with appellant because he was in the YOYP program the previous year. He also saw appellant regularly during his rounds at juvenile hall. Appellant had completed on time the institutional phases of YOTP and was released without additional time. He acknowledged there had been instances in which some youth have been sent back to the program.

Programs available at the YOTP included completion of high school or GED equivalent, college courses, individual or family counseling, substance abuse treatment, Boys' Council (which addresses healthy perceptions of masculinity and relationships), a program dealing with social skills, self-change, and problem solving, aggression replacement training, employment skills training, and a work experience program. While appellant was in YOTP, he had the opportunity to participate in these programs.

After the conclusion of testimony, the prosecutor argued in favor of committing appellant to the DJJ, while appellant's counsel asserted the minor should be allowed another try at the YOTP, a less restrictive alternative.

Court Probation Officer Keedy reiterated her department's recommendation that appellant be detained in the DJJ. She noted appellant had been placed on probation three years ago, thus, services in the community had been tried. Keedy detailed appellant's criminal history of offenses and probation violations during that period, concluding he needed a structured environment and more intensive services provided by the DJJ, including gang interventions.

Following argument, the court stated it had considered the disposition report, the evaluation from YOTP Propriety, and the social history and

9

letters submitted by appellant's counsel. The court first observed "a decision of this magnitude is never an easy decision, and no one lightly imposes a sentence to—or disposition to the Department of Juvenile Justice." The court then explained it had an obligation to evaluate the benefits and effectiveness of the various options and to select the least restrictive one that would benefit appellant based on all of the information the court had. The court indicated it had considered home supervision and "the Ranch,"[5] first rejecting home supervision because it was not requested and because appellant had twice cut off his ankle monitor, had multiple curfew violations, and had committed multiple crimes while under supervision. Next, the court rejected the Ranch because it did not provide the required security in view of appellant repeatedly absconding from supervision.

"The real question," according to the court, was whether having appellant repeat YOTP would likely be effective. Rejecting this option, the court found the evidence did not support such a commitment given appellant's history of continued criminal behavior and probation violations. Significantly, the court commented that appellant was using drugs, threatening people, and recently conspiring to commit robbery. Additionally, he obtained a law enforcement officer's firearm, was seen in videos firing off a firearm at nighttime, and, in 2018, committed the violent offenses of robbery and assault with force likely to cause great bodily injury. Moreover, the court did not believe "public safety can be appropriately protected by returning him to YOTP." In short, the court had no faith appellant had changed his behavior or learned anything from his "many months in YOTP the first time."

---

[5] This placement is more formally known as the Orin Allen Youth Rehabilitation Facility.

Based on appellant's "entire conduct," the court concluded, "no sanction short of [the] Department of Juvenile Justice will be effective."

Citing various programs, the court found the rehabilitative benefits of the DJJ weighed in favor of such a commitment. The court highlighted DJJ's aggression training, counterpoint program, high school classes, job training, college courses, and mental health treatment. Though YOTP had similar courses and training, the DJJ courses, in the court's view, were more "intensive and longer term at DJJ."

The court ordered appellant committed to the DJJ.

## B. *Applicable Principles*

Under section 725.5, the juvenile court must consider the circumstances and the gravity of the offense committed by the minor. In determining how best to rehabilitate a minor and to afford him or her adequate care, the court must consider the broadest range of information. (*In re Robert H.* (2002) 96 Cal.App.4th 1317, 1329.) A juvenile court's order may be reversed on appeal only upon a showing of abuse of discretion. Appellate courts must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them. (*Id.* at pp. 1329–1330.)

The record must be viewed in light of the purposes of juvenile law. As described in section 202, those purposes include rehabilitation, treatment, guidance, punishment as a rehabilitative tool, and protection of the public. (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576.) To that end, the juvenile court considers the probation officer's report and any other relevant material evidence that may be offered (§ 706), as well as the age of the minor, the circumstances and gravity of the offense, and the minor's previous delinquent history (§ 725.5). Courts do not necessarily abuse their discretion in ordering

11

a juvenile to the most restrictive placement before other options have been tried. (*In re Eddie M.* (2003) 31 Cal.4th 480, 507.) It is error, however, for the juvenile court to fail to consider less restrictive alternatives to DJJ commitment. (*Teofilio A.*, at p. 577.)

## C. *The Trial Court Did Not Abuse Its Discretion in Committing Appellant to the DJJ*

### 1. *Substantial Evidence Supports the Juvenile Court's Decision That There Was No Less Restrictive Alternative to DJJ Commitment*

" 'The appellate court reviews a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision.' " (*In re A.R.* (2018) 24 Cal.App.5th 1076, 1080.) A DJJ commitment is not an abuse of discretion when the record demonstrates "both a probable benefit to the minor . . . and the inappropriateness or ineffectiveness of less restrictive alternatives." (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396.)

Before deciding to commit appellant to the DJJ, the record demonstrates the court considered less restrictive placements and expressed sound reasons for rejecting them. First, the court reviewed the disposition report authored by a probation officer. The report considered and rejected the YOTP, citing appellant's recent probation violations and his prior history. The report observed that appellant had exhibited " 'sophisticated and dangerous' " behavior in the planning of and stealing a law enforcement officer's firearm and shooting firearms in various locations at night. The report also focused on appellant's " 'obvious and proud' " gang membership that " 'encourages substance use, criminal activity and the use of dangerous and deadly weapons' " chronicled in appellant's social media. Even though appellant had several chances to correct his behavior utilizing the skills and tools he learned about in the YOTP, the report noted he continued to

12

associate with his antisocial peers and engage in his " 'criminal patterns.' " Because appellant had recently completed the YOTP, and in view of his troubling behavior upon release, probation did not screen him for the YOTP. Instead, the probation officer believed appellant would benefit from the extensive DJJ programs and based on appellant's escalating criminal activity and "non-compliance," committing appellant to the DJJ would be in his best interests.

Moreover, as well as the disposition report, the court reviewed the YOTP evaluation, appellant's social history, and letters submitted by appellant's counsel.

Second, the court heard and considered the testimony of the probation officer who authored the disposition report. He confirmed the DJJ was the appropriate placement and explained why remediating appellant back to the YOTP would be inappropriate. The court also heard from the institutional supervisor of the YOTP who described the programs in which appellant had the opportunity to participate while a resident at the YOTP.

Lastly, at the outset, the court stated it had considered home supervision and the Ranch, less restrictive placements, rejecting home supervision because appellant cut off his ankle monitor twice, had multiple curfew violations, and committed multiple crimes while under home supervision. Next, the juvenile court rejected the Ranch as it did not have the required security to prevent appellant from absconding. Finally, the court rejected the YOTP, given appellant's criminal behavior and probation violations. Of particular concern to the court was appellant's use of drugs and his threatening behavior. The court also focused on the fact appellant had recently conspired to commit robbery and had obtained a law

13

enforcement officer's firearm. Having no faith that appellant had changed his behavior, the court settled on the DJJ.

We agree with the juvenile court's assessment of less restrictive placements. Following his commitment to the YOTP, appellant's conduct should have shown improving maturity and a greater sense of responsibility. Instead, he regressed. Accordingly, in light of appellant's escalating criminal behavior, his failure to adhere to the terms of his probation, and his failure to utilize the skills and tools he learned in the YOPT, the juvenile court reasonably determined there was no less restrictive alternative that would be effective or appropriate.

### 2. Substantial Evidence Supports the Juvenile Court's Decision That Commitment to the DJJ Would Provide a Probable Benefit to Appellant

Two sets of facts strongly support the juvenile court's determination that appellant would probably benefit from the treatment services at the DJJ. First, three months after completing the in-custody portion of the YOTP and being placed on home supervision, in April 2020, the probation department filed a notice of probation violation alleging appellant left his residence without permission, used alcohol, broke curfew, was photographed holding a black firearm with an extended magazine, and associated with a person not approved by the probation officer. Then in June of that year, appellant persuaded the daughter of a law enforcement officer to obtain and give him her father's Glock firearm. Clearly, appellant was unable to function outside of the confines of the YOTP's structured environment.

The second set of facts indicating commitment to the DJJ would probably be appropriate is, as the court highlighted, the DJJ programs, including aggression training, counterpoint program, high school classes, job training, college courses, and mental health treatment. The YOTP does have

14

similar courses and training, but the DJJ courses described by the court are more "intensive and longer term at DJJ."

Appellant's reliance on *In re Carlos J.* (2018) 22 Cal.App.5th 1 (*Carlos J.*) is misplaced. Carlos J. participated in a gang-related shooting. (*Id.* at p. 4.) He admitted one count of assault with a firearm (Pen. Code, § 245, subd. (a)(2)) with a criminal street gang enhancement (*id.*, § 186.22, subd. (b)(1)(B)). (*Carlos J.*, at p. 4.) Following a contested dispositional hearing, the juvenile court committed Carlos J. to the DJF. (*Ibid.*) Carlos J. contended, and our colleagues in Division Five agreed, that the juvenile court's finding of probable benefit from a DJF commitment was not supported by substantial evidence. (*Id.* at p. 5.) In finding the juvenile court's commitment of Carlos J. to the DJF to be an abuse of discretion, Division Five explained, "there was no evidence before the juvenile court regarding any 'intensive treatment' [Carlos J.] might receive at the DJF." (*Id.* at p. 10.) For example, the juvenile court acknowledged Carlos J. suffered from posttraumatic stress disorder and declared it certainly needed to be addressed. Nevertheless, there was no information before the juvenile court regarding any mental health services at the DJF. The same was true for gang intervention services. (*Id.* at p. 11.)

Importantly, the *Carlos J.* court focused on the probation department's failure to include some description in its report of the relevant DJJ programs to address the minor's needs. (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 12.) However, the court clarified that the probation department "is not required in its report and initial testimony to provide indepth information about the DJF's programs or to preemptively respond to even predictable criticisms of DJF. Under Evidence Code, section 664, where the probation officer has identified programs of benefit to a minor and provided brief information

15

about the most important programs, it may be presumed the probation officer's recommendation is based on an assessment the programs are available and appropriate. If a minor wishes to dispute the availability or efficacy of particular programs, or to suggest that other conditions at the DJF undermine the programs, the minor must present sufficient evidence to reasonably bring into question the benefit he or she will receive from the adoption of the probation department's recommendation." (*Id.* at p. 13.)

Here, in contrast to *Carlos J.*, there was no dearth of information about the programming at the DJJ and its probable benefit to appellant. The disposition report and recommendation detailed the available programs to address appellant's needs. The report stated: "In addition to treatment designed to address his criminogenic needs such as AIT and Counterpoint, James would benefit from completing high school and participating in the DJJ Career Technical Education (CTE). While in CTE[,] James would have access to programs which include certifications in landscape design, irrigation design, forklift safety, equipment safety, tractor safety, landscape principles, and practices, horticultural science, and computers and related technology (Microsoft Office Specialist certifications), culinary arts applications, or college courses offered through the Coastline Community College through which he could earn his Associates of Arts degree and from which most college credits are transferrable to the state college system." As to appellant's mental health issues, the report indicated he "would be subject to extensive mental health resources and afforded the opportunity to participate in extensive rehabilitative therapy." And prior to appellant's release, he would "create a detailed transition plan to effectively utilize all available community resources to allow for a structured, successful community reintegration."

In finding appellant would benefit from a commitment to the DJJ, the court highlighted several of the programs, including the DJJ's aggression training, counterpoint program, high school classes, job training, college courses, and mental health treatment. The court believed these DJJ programs were "intensive and longer term" in comparison to those at the YOTP.

Additionally, unlike the YOTP, the fact that the DJJ is a secured facility is beneficial to appellant because it would eliminate the prospect of appellant fleeing and sabotaging any progress he might be making.

In short, given appellant's lack of self-discipline, his disregard for his obligations as a member of civil society, his failure to adhere to the terms of his probation, and his continuing criminal behavior, the juvenile court's decision to commit appellant to the DJJ for his own benefit was both reasoned and reasonable.

Accordingly, we affirm the commitment to the DJJ as within the juvenile court's proper exercise of discretion.

## III.  DISPOSITION

The order is affirmed.

MARGULIES, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A161240
*In re James L.*