Filed 6/30/22  In re A.T. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.T., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. A.T., Defendant and Appellant. | A162265 <br><br> (Alameda County Super. Ct. No. JV02991701) |

A.T. appeals from the juvenile court's disposition order committing him to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ)[1] following his admission to one count of assault with a firearm (Pen. Code, § 245, subd. (a)(2)), and allegations of personal use of a firearm (Pen. Code, § 12022.5, subd. (a)) and active participation in a criminal street gang (Pen. Code, § 186.22, subd. (b)(1)).  Appellant contends DJJ commitment

---

[1]    DJJ is also known as the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF), and the terms DJJ and DJF are used interchangeably in the case law.  (*In re J.B.* (2022) 75 Cal.App.5th 410, 413, fn. 1.)  We will use "DJJ" and treat any references to the DJF in the record and case law as references to DJJ.

1

was an abuse of the juvenile court's discretion because the evidence did not show (1) that the commitment would result in a probable benefit to him, and (2) that less restrictive alternatives would be inappropriate or ineffective. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Shooting Incident

On June 18, 2018, appellant fired multiple rounds at unmarked police cars as the officers attempted to perform a vehicle containment technique on the car appellant was riding in. The officers were members of a multi-agency task force investigating several gang-related incidents of violence throughout the month of June 2018.[2] The violence was believed to be part of an ongoing feud between two rival street gangs—the HOGGs and Decoto—after the murder of HOGGs member Teddy Mejia in 2015 by suspected Decoto gang members.

Task force officers observed confrontational social media interactions between the rival gang members showing known gang members referring to rivals and displaying gang signs and hand signs intended to show disrespect. These posts included photographs of appellant and other HOGGs members

---

[2]     These incidents were as follows. On the morning of June 9, 2018, a woman was fired upon by assailants driving a green or gray minivan. Later that day, someone in a gray, green, or light blue minivan fired upon an 11-year-old girl and her 15-year-old brother, both of whom were tied to members of the Decoto XIV gang (Decoto). Nearby surveillance cameras captured footage of the minivan, giving police the vehicle's make and model (Honda Odyssey) and license plate number. On June 14, 2018, members or associates of the Decoto gang were shot while gathering to pay respects to a fellow gang member at the Chapel of the Chimes cemetery, and surveillance cameras captured footage of the Honda Odyssey driving from the chapel at a high rate of speed immediately after the shots were fired.

making gang signs and displaying guns.[3]  Appellant also shared snippets of gangster rap videos made by him or his father, a well-known HOGGs member.  A Honda Odyssey minivan believed to have been involved in prior shooting incidents that month was depicted in some of the social media postings.

On the evening of June 18, 2018, the task force observed a live video stream of appellant and HOGGs members, E.L. and A.V., driving through Decoto territory in a stolen Toyota vehicle.  Concerned that the group was targeting Decoto members, the officers conducted surveillance on a cell phone belonging to A.V. and, after locating the Toyota, attempted to perform a vehicle containment technique on it.  Just as the officers positioned their unmarked vehicles around the target, and before they could turn on their lights and sirens, a barrage of gunfire struck the vehicles driven by Officers Jamil Roberts and Tom Edwards.  Appellant and A.V. fled the scene on foot and were pursued by Edwards, who found appellant hiding behind a car.  After appellant ignored commands to surrender and reemerged unexpectedly, Edwards fired at appellant and grazed him, and appellant surrendered.  A Glock .34 handgun was found nearby.

The Toyota maneuvered out from among the police cars and was later abandoned.  Officers eventually found and arrested A.V. and E.L.  A.V. was in possession of the keys to the aforementioned Honda Odyssey.  Appellant's hand had gunshot residue on it, and his thumbprint was found on the Glock .34.  Several casings found at the scene and in Officer Roberts's car were determined to have been fired from the Glock .34.  Appellant later acknowledged he had fired at the police from the backseat of the Toyota.

---

[3]     Appellant was not known as a gang member to law enforcement prior to the June 18, 2018, shooting incident.

3

Appellant was detained at juvenile hall.

## II.    Juvenile Wardship Petition

The district attorney filed a wardship petition (Welf. & Inst. Code,[4] § 602, subd. (a)), against appellant, age 16, alleging two counts of attempted murder of Officer Roberts (Pen. Code, §§ 187, subd. (a), 664, subd. (e); count one; §§ 187, subd. (a), 664, subd. (a); count two), with special allegations of personal and intentional discharge of a firearm (Pen. Code, § 12022.53, subd. (c)) on each count.  The petition was amended several times thereafter to add a criminal street gang enhancement (Pen. Code, § 186.22, subd. (b)(5)) to count one, a determinative sentence for gang-related violent felony enhancement (Pen. Code, § 186.22, subd. (b)(1)(C)) to count two, and additional counts for the attempted murder of Officer Edwards (Pen. Code, §§ 187, subd. (a), 664, subds.(a), (e); counts three and four), assault with a firearm (Pen. Code, § 245, subd. (a)(2); counts five and six), and shooting at an occupied motor vehicle (Pen. Code, § 246; counts seven and eight), with firearm and gang enhancements on the additional counts.

## III.    Motion to Transfer to Adult Court

The prosecution moved to transfer appellant's case to adult criminal court.[5]  Hearings were held over the course of several months from March to September 2020.  We now summarize the pertinent testimony.

---

[4]    Further section references are to the Welfare and Institutions Code unless stated otherwise.

[5]    Under section 707, subdivision (a), the prosecution may move to transfer a minor alleged to be a ward by reason of their violation of any offense listed in subdivision (b) (which includes assault with a firearm [§ 707, subd. (b)(13)]) from juvenile court to a court of criminal jurisdiction.  In deciding a transfer to adult court, the juvenile court must consider the degree of criminal sophistication; the potential for rehabilitation by the minor prior to the expiration of the court's jurisdiction; the minor's previous delinquent

4

### A. Probation Officer Vanesa Imperial

Imperial authored the probation department's original and amended transfer hearing reports[6] and gave testimony at the hearings. She attempted but was unable to interview appellant's parents for her report. She interviewed appellant's paternal uncle, Agustin Villasana, who reported that appellant's father was a well-known member of the HOGGs gang. Villasana described appellant as a "good kid" with an unstable home life due to his family's poverty and homelessness, the father's long-term gang involvement and marital infidelity, and the mother's mental health issues and substance abuse. From birth to age 16, appellant experienced several abrupt transitions in his homes and schools, as well as cities and states. And as the oldest of three children, he was often burdened with the role of family caregiver. Appellant had no prior delinquency history.

Imperial noted that appellant's father was "reportedly in a leadership position within HOGGS and has a respected reputation in certain Hayward neighborhoods. Unfortunately, young [appellant] was both very curious about [this] aspect of his father's life and also admired his father's street fame." In 2016, appellant experienced several traumatic events when his paternal cousin and godfather were killed in gang-related shootings, and a paternal uncle was shot and killed as an innocent bystander. When Imperial spoke to appellant in July 2020, he denied HOGGs membership but his social

---

history; success of previous attempts at rehabilitation; and the circumstances and gravity of the offense. (§ 707, subd. (a)(3)(A)–(E).)

[6] Imperial initially recommended that appellant's matter be transferred to adult court based on the severity of the case and the sophistication of the crime, but she was later ordered by her superiors to change her recommendation to no transfer.

media posts showed him in the company of HOGGs members making HOGGs gang signs.

Imperial considered alternative placements for appellant including the minimum-security residential program at Camp Wilmont Sweeney (Camp Sweeney) and out of home placement. Appellant's uncle, Villasana, offered to have appellant live with him.

### B. Sergeant Andrew Gannam

Gannam testified as an expert in gangs, with special expertise regarding the HOGGs and Deocoto gangs. According to Gannam, appellant's father was a member of the HOGGs, as were appellant's accomplices, E.L. and A.V.

Gannam provided details of appellant's social media presence to support his opinion that appellant was an active and full-fledged member of the HOGGs. Appellant identified himself on social media as "lilally211"—his nickname and the HOGGs gang symbol "211." Various social media posts from January to June 2018 showed appellant making gang signs in the presence of other HOGGs gang members, including appellant's father and brother, J.T. He had numerous exchanges discussing gang activities, including arming in the event of a confrontation and looking for rival gang members for "an easy shooting, an easy hunt." Appellant's social media account contained pictures of murdered HOGGs member Mejia, who was appellant's uncle and whose murder began the feud between the gangs. Appellant also referenced a gang rap video in which his father boasted that appellant " 'graduated from a boxer to a shooter,' in reference to [appellant] no longer boxing and now becoming a full-fledged gang member, a shooter."

Gannam gave several reasons for his belief that appellant remained an active HOGGs member while in juvenile hall. In a recorded call with his

6

mother, appellant explained that he had to identify himself with the HOGGs in order to not be placed with rivals. And it was significant that as soon as appellant entered the unit, he was recognized by rival gang members as a HOGGs member. As late as January 2020, appellant had a phone call with his father in which he relayed how he and a fellow HOGGs member were recruiting another juvenile hall youth to join the HOGGs. Appellant also released gang rap videos or played a role in how they were released while in juvenile hall. In one video entitled "2 Deep," appellant appeared to make references to the Chapel of the Chimes shooting.[7]

Gannam further testified regarding additional pertinent phone calls between appellant and others while appellant was in juvenile hall. In June 2018, shortly after appellant's arrest, he and fellow gang members discussed using appellant's mother to smuggle in a "wax pen" vaporizing device. Appellant also had conversations with Villasana about disconnecting appellant's phone to prevent the police from accessing its contents, and Villasana said he would do so. In November 2019, appellant discussed a plan with other minors to smuggle Xanax into juvenile hall and also advised a friend on how to do so.

### C. Probation Officer Edy Elias

Elias investigated potential placements for appellant. She contacted two out-of-state academies but was informed they would not accept appellant due to his age (then almost 19 years old) and/or the violent nature of the charges against him. Elias felt that DJJ would be an appropriate disposition because it accepted offenders up to age 25 who were charged with section

---

[7] Specifically, Gannam testified that the lyric " 'We were riding three deep, and five dropped' " was a reference to the three HOGGs members who perpetrated the shooting and the five Decoto affiliates who were shot.

707, subdivision (b) offenses, and had programs for gang diversion, victim awareness, individual therapy, and cognitive behavioral therapy.

### D. Social Worker Trinh Reyes

Reyes was appellant's clinician at the Juvenile Justice Center (JJC) Guidance Clinic. She testified that appellant was very receptive to her counseling and therapy, and that she received positive reports from those who worked with him in juvenile hall. His treatment plan focused on decreasing his symptoms of depression and anxiety.

### E. Forensic Social Worker Megan Low

Low testified as an expert in juvenile delinquency. She interviewed appellant on multiple occasions, had several interviews with his family members, and consulted with several juvenile institutional officers (JIOs) and teachers from juvenile hall. Low provided detailed testimony regarding appellant's family history of poverty, homelessness, instability, and his father's marital infidelity. Low knew that appellant's grandfather was a HOGGs member who had spent time in prison. She explained that appellant had been "traumatized" by gang violence against his relatives and close family friends, including the shooting death of his godfather during a first communion service in which appellant was in attendance. Low testified that the staff were uniquely supportive of appellant.

Appellant's father told Low that he had distanced himself from the HOGGs in 2016 to focus on his music, and that he had always kept his gang involvement separate from the family. Low noticed that appellant admired his father's notoriety as a HOGGs leader. Appellant "denied being an actual member of HOGGs every time" Low asked him about it. He also denied that the song "2 Deep" made references to the Chapel of the Chimes shooting.

8

Appellant denied that other family members, including his younger brother J.T., were involved in gangs.

Low felt that appellant's uncle, Villasana, would be a suitable placement for appellant. Villasana had an associate's degree in criminal justice and a bachelor's degree in psychology, and he worked as a mental health rehabilitation specialist. He owned his own home in Tracy and had a room available for appellant.

### F. The Juvenile Court's Ruling

After considering the evidence and arguments of counsel, the juvenile court denied the transfer motion. The court found that despite appellant's criminal sophistication and the circumstances and gravity of his offense,[8] he was still capable of being rehabilitated within the juvenile court's jurisdiction.

Appellant then admitted guilt as to the fifth count for assault with a firearm on Officer Roberts as well as the firearm and gang enhancements allegations on this count. The remaining counts were dismissed, with facts and restitution to remain open, and the matter was set for disposition.

### IV.    Disposition

In his disposition brief, appellant requested commitment to Camp Sweeney followed by placement with his uncle Villasana as a condition of probation. Alternatively, appellant asked to be released on probation to his

---

[8]    Notably, the juvenile court found that appellant and his accomplices did not "envision[] having this exchange with the officers" or "intend[] to get into an altercation with the police." However, the court also found that appellant's conduct showed "a high level of criminal sophistication," such as his post-arrest acts of lying to the police about his whereabouts prior to the incident and his relationships with his co-participants, as well as his instruction to his uncle Villasana "to turn off [his] phone in order to hide potential evidence."

9

other uncle, Andrew Douangmala, in Minnesota. The disposition report attached a letter dated November 13, 2020, from social worker Low supporting these proposed placements.

The probation department submitted a disposition report recommending that appellant be committed to DJJ because he was at risk for recidivism and continued gang involvement. According to the probation department, appellant's recidivism risk was assessed to be in the "moderate" category of reoffending within the next year, with his highest risk factors were identified as "family/parenting, peer relations and attitude/orientation."

In addressing alternatives to DJJ commitment, the probation department reported that appellant had been rejected from two out-of-state academies due to his age and the nature of his offenses, and that he was likewise no longer age-eligible for in-state camps like Camp Sweeney.[9] He was also ineligible for a short term residential program due to his age, the gravity of his offense, and his gang entrenchment.

As for the proposed placement with an uncle, the probation department indicated that it was "unclear how either uncle can ensure the follow through of [appellant's] participation in counseling/therapy, college/vocational training/employment, interacting with positive peers or working towards becoming financially independent." The department believed that releasing appellant to a family member would allow too much "freedom for the youth to interact with undesirable peers, re-connect with his 'brothers,' [appellant] referred to as his fellow gang associates and potentially reignite exposure

---

[9]     According to the Camp Sweeney brochure in the record, the camp's eligibility criteria indicated that "[y]outh must be between the ages of fifteen (15) and nineteen (19)," but that "[i]n extenuating circumstances, and on a case-by-case basis, exceptions to the exclusion criteria can be made given an appropriate plan is developed to address the youth's individual needs."

10

through social media." Furthermore, the Screening for Out-of-Home Placement (SOS) committee found that release to a family member was inappropriate due to the sophistication of appellant's crime and his gang immersion.

The probation department's report attached informational materials describing the various programs at DJJ, including cognitive behavioral replacement training for substance abuse, cognitive behavioral intervention for preventing recidivism (CounterPoint), and guided journaling on various topics, including victim awareness. The programming materials also detailed various educational and vocational opportunities at DJJ, including postsecondary education, preapprentice programs in construction, carpentry, and computer coding, and leadership training. DJJ also provided the opportunity to participate at the Pine Grove Youth Conservation Camp (Pine Grove), a fire camp operated jointly by Cal Fire and DJJ.

A contested disposition hearing took place in December 2020 and January 2021. By that time, appellant had been in custody at juvenile hall for about two and a half years, during which he received his high school diploma and enrolled in community college. The juvenile court considered all the evidence and testimony from the transfer proceedings, as well as testimony from following witnesses.

### A. DJJ Community and Court Liaison Lorraine Custino

Custino testified about DJJ's intake process and programming. All entering youth from Northern California go to the Chaderjian (or Chad) intake facility in Stockton. Youths are assessed for mental health issues and meet with a psychologist to see if there are any current issues or if they need to be placed into the mental health residential unit. There are two and a half psychologists assigned to the general population in the "core units," with 36

to 38 youths housed in the core units at Chad. Each youth has a treatment team consisting of youth correctional counselors, a parole agent or casework specialist, an education representative, and a mental health clinician (if applicable).

Custino explained that CounterPoint is a four-month, 33-session cognitive behavioral-based intervention program at DJJ that deals with the issues underlying gang involvement, such as decision making and negative peer association. It is designed to help youth develop prosocial attitudes and lasting skills. DJJ also addresses a youth's gang affiliation issues by working with innovative grant programs and community partners, including "credible messengers, men who have been in the same type of situations like this youth."

All youths committed to DJJ are required to attend school full time. Students who attain a high school diploma or equivalent are eligible to participate in post-secondary education programs, including a college program, vocational training, or a combination of both. Custino described further educational opportunities including online learning, remote art instruction, including film production, and religious services. Available athletics programs include intramural sports, a full gym, sports fields, and a swimming pool. All youth also engage in a 52-week "skill of the week" course that teaches a different skill each week. DJJ seeks to maintain a youth's connection with their families and communities during rehabilitation by providing interactive program grants and family involvement, along with weekly visits.

### B. Camp Sweeney Superintendent Jessica Fort

Fort testified that Camp Sweeney's services are geared for 15 to 18-year-olds. The camp has never made an exception to admit a youth who, like

appellant, was already 19 years old. The camp could make an exception to its eligibility criteria under "exigent circumstances," but there is no "set criteria" in this regard. Fort testified that if, for example, a 19-year-old has a dependent child and is a significant person in the child's life, "that is the type of thing that would be something that we would consider as a mitigating factor that might overcome" the Camp's eligibility restrictions.

Fort additionally testified that she would make an exception for appellant if ordered to do so, but she maintained that she "would have some reservations on how we would create an appropriate plan for him" while "mak[ing] sure everybody was safe." She further testified that the camp's gang intervention group was, at the time of her testimony, "suspended, due to Covid restriction."

### C. Appellant's Statement

Appellant read a statement at the disposition hearing discussing the difficulties of his upbringing, the impact of gang violence in his life, and the progress he had made at juvenile hall. His plans for the future included graduating from college, having his own clothing brand, and accepting a job offer for construction work in Stockton. Appellant also read a poem he had written.

### D. The Disposition Order

The juvenile court first found that because appellant had personally used a firearm in the commission of a violent felony, section 602.3, subdivision (a), required that appellant be adjudged a ward of the court and placed in juvenile hall, ranch, camp, or with DJJ. Next, the court found that Camp Sweeney was not a suitable placement due to appellant's age. Despite Fort's testimony that the camp would accept appellant if ordered to do so, the court declined to "create separate programming" for appellant.

13

According to the juvenile court, appellant "would benefit from the programming at DJJ" and the "highly-structured, secure environment," as well as "from such programs as formalized substance abuse counseling, victim awareness programming, mental health counseling and the Counter[P]oint program." He would also be able to continue his education and choose vocational training at DJJ. The court commended appellant for his progress to date but found "there is more work to be done towards reducing the behavior that brought him into contact with the justice system."

The juvenile court adjudged appellant a ward of the court and ordered a maximum term of imprisonment of 14 years, with 979 days of custody credits, and a maximum period of confinement to DJJ of two years based on the facts and circumstances of the matter. This timely appeal followed.

## DISCUSSION

We review the commitment decision " 'for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision.' [Citation.] 'A DJJ commitment is not an abuse of discretion where the evidence demonstrates a probable benefit to the minor from the commitment and less restrictive alternatives would be ineffective or inappropriate.' " (*In re A.R.* (2018) 24 Cal.App.5th 1076, 1080–1081 (*A.R.*)

We examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law. (*In re Calvin S.* (2016) 5 Cal.App.5th 522, 528 (*Calvin S.*).) "The purpose of juvenile court law is to protect both the public and the minor 'and to preserve and strengthen the minor's family ties whenever possible.' [Citation.] A minor must receive 'care, treatment, and guidance' consistent with the best interest of both the minor and the public and, for minors who commit crimes, the disposition must hold them 'accountable for their behavior,' be appropriate for the

14

circumstances, and conform with rehabilitative objectives and the interest of public safety and protection. [Citation.] In engaging in its deliberations, the court must consider public safety, victim redress, and the best interests of the minor." (*In re J.C.* (2017) 13 Cal.App.5th 1201, 1217 (*J.C.*).)[10]

## I. Probable Benefit

Appellant challenges the sufficiency of the evidence of probable benefit from four specific DJJ programs cited by the juvenile court in its disposition ruling: CounterPoint; substance abuse counseling; mental health counseling; and victim awareness programming. We address each program in turn.

### A. CounterPoint

As described in the DJJ informational materials and Custino's testimony at the disposition hearing, CounterPoint, while not strictly a gang intervention program, deals with the behavioral issues that underlie gang involvement, such as decision making and negative peer association, and provides participants with the social skills necessary to develop more pro-social attitudes. In addition to CounterPoint, DJJ works with community partners who, according to Custino, have been in the "same type of situations" as appellant—presumably former gang members—to "deal with the gang-affiliation issues." This was substantial evidence from which the juvenile court could reasonably conclude that DJJ's programs would provide

---

[10] DJJ is in the process of being phased out. In 2020, the Legislature passed "juvenile justice realignment" through Senate Bill No. 823 (2019–2020 Reg. Sess.) (Stats. 2020, ch. 337). As of July 1, 2021, newly enacted section 736.5 shifts responsibility for youth offenders from DJJ to county governments. (§ 736.5, subd. (a).) However, wards, like appellant, who were committed to DJJ prior to July 1, 2021, "shall remain within its custody until the ward is discharged, released or otherwise moved pursuant to law, or until final closure of [DJJ]" on June 30, 2023. (§ 736.5, subds. (d), (e).)

a probable benefit to appellant by giving him the necessary tools to disengage from gang influence.

Appellant maintains, however, that he was not a candidate for CounterPoint or would not likely benefit from it in view of Custino's testimony that the DJJ program is for youths with demonstrated difficulties in self-monitoring and self-regulating. Relying on language from *In Carlos J.* (2018) 22 Cal.App.5th 1, 12 (*Carlos J.*) that there must be "some concrete evidence in the record about relevant programs," appellant suggests CounterPoint is not "relevant" because it is geared towards youth who lack skills that he already possesses. We decline to draw that inference in appellant's favor, as it is contrary to our role in reviewing for abuse of discretion. (*A.R.*, *supra*, 24 Cal.App.5th at p. 1080.)

It is true that the record reflects appellant made great strides during his time at juvenile hall, and we commend him for this. Numerous witnesses at the transfer hearing attested to appellant's character, leadership, maturity, and openness to change.[11] However, no witness suggested there was not more work to be done, and many of the witnesses were unaware of

---

[11] For instance, probation officer Imperial testified that all of appellant's JIOs described him as exceptionally well-behaved, polite, and a role model to other minors. Lisa Harris, who directed the Alameda County Library's Social Justices Services, testified about appellant's intelligence, openness, leadership with younger children, and interest in reading. JIO Devin Branch testified that appellant was respectful, attentive, mature, used coping skills, and that he was one of the best youths in the facility. JIO Marcus Tobie similarly testified that appellant was respectful, a leader among his peers, had owned up to his past mistakes, and used the tools he learned to keep a steady demeanor. Matt Campbell, a teacher at juvenile hall, testified that appellant had great potential, was serious about academics, and kept his composure while playing competitive sports. Carly Finkle, who ran The Beat Within writing workshop, testified that appellant was a talented writer and had stepped into a leadership role in the program.

the extent of appellant's gang affiliations and their impact on his life. Moreover, the record shows that appellant repeatedly denied his gang membership despite his affiliation with gang members, a circumstance which social worker Low indicated is a "cause for concern" that appellant is "not as far along necessarily in [his] own rehabilitative process as [he] need[ed] to be."

Additionally, the juvenile court could infer from Sergeant Gannam's testimony about appellant's gang-related activities in juvenile hall that appellant was still in need of intervention to learn how to sever his ties to the HOGGs gang. And because CounterPoint is intended for offenders with a greater likelihood of reoffending, the court could reasonably infer from appellant's "moderate" risk for reoffending within the next year, as well as the evidence of his gang immersion, that appellant would be eligible for and likely benefit from CounterPoint.

Based on the foregoing, and indulging all reasonable inferences in favor of the juvenile court's decision, we conclude the probable benefit finding as to CounterPoint was supported by substantial evidence.

### B. Substance Abuse Counseling

The juvenile court also identified a probable benefit from DJJ's substance abuse counseling program, but appellant contends this finding lacked evidentiary support because nothing in the record indicated he was abusing substances while in juvenile hall. Appellant also questions whether he would be accepted into the program, as DJJ materials indicate the program is " 'designed for individuals who are moderate to high need in the area of substance abuse.' "

We conclude substantial evidence supported the juvenile court's probable benefit finding. According to the probation department, appellant

17

admitted to "daily" marijuana use and experimentation with codeine cough syrup prior to his time at juvenile hall. Indeed, he "admitted feeling like he had a substance abuse problem with weed when he was smoking it regularly." The probation department also reported appellant's "chronic" use of drugs as a way of coping with the trauma of gang-related violence in his life. Moreover, while appellant was in juvenile hall, he discussed plans with others to smuggle in a wax pen and Xanax pills. Thus, even assuming appellant did not regularly use substances in juvenile hall, the evidence of his past substance abuse and its connection to his experiences with gang violence supports a reasonable inference that he would benefit from substance abuse intervention to maintain lasting sobriety. Accordingly, we conclude there was substantial evidence that appellant would likely be eligible for and benefit from substance abuse programming at DJJ.

### C. Mental Health Programming

Appellant contends he would not qualify for DJJ's mental health programming because he did not have a diagnosed mental health need, diagnosis, or disorder. He further contends that because DJJ employs only two and one-half psychologists per core unit, and there are 36 to 38 youth per unit, he would not receive regular mental health treatment.

We decline to infer in appellant's favor that he would not qualify for or receive a probable benefit from DJJ's mental health services, as the evidence in the record could reasonably suggest otherwise. As Custino testified, youth are assessed upon intake for any mental health issues, and "[e]ven [for] youth that are not officially screened for mental health, a psychologist meets with them upon arrival and can determine if they possibly need to be on that residential unit." Custino clarified that DJJ's mental health interventions were available not just based on a diagnosis, but on "variety of things" such

18

as behavioral issues. Custino further explained that all of DJJ's psychologists were trained in trauma-informed therapy and worked full time. From this, as well as Low's testimony regarding appellant's history of childhood trauma and Reyes's testimony about appellant's symptoms of depression and anxiety, the juvenile court could reasonably conclude that appellant would be eligible for and receive DJJ mental health programming that would be suitable to his needs.

### D. Victim Awareness Programming

Appellant argues that DJJ's journal program "clearly does not provide what the court saw as necessary victim awareness programming[.]" We conclude substantial evidence supports the juvenile court's finding otherwise. As detailed in the programming information, DJJ's victim awareness journaling program "helps youth begin to consider the idea of taking personal responsibility for their criminal behavior and ways to make amends for the harm they have caused." The program "is assigned and completed at [the] youth's assigned treatment program for use by the youth and treatment team." Among the members of the treatment team are a youth correctional counselor and senior correctional counsel, and Custino testified the correctional counselors are specialists in social work. The juvenile court could reasonably conclude that such a journaling program would help appellant reflect on the impact of his crimes and provide a probable benefit to him.

Based on the foregoing, we conclude the juvenile court did not abuse its discretion in finding that DJJ's programs would provide a probable benefit to appellant.

19

## II.    Less Restrictive Alternatives

A juvenile court commits reversible error if it fails to consider less restrictive alternatives to DJJ commitment.  (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 577.)  There must be evidence in the record demonstrating the inappropriateness of the less restrictive alternatives.  (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 485.)

Because DJJ is "the state's most restrictive placement for its most severe juvenile offenders" (*In re Miguel C.* (2021) 69 Cal.App.5th 899, 902 (*Miguel C.*)), DJJ placement "is normally a placement of last resort[.]"  (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1250.)  The juvenile court law " 'contemplates a progressively more restrictive and punitive series of dispositions starting with home placement under supervision, and progressing to foster home placement, placement in a local treatment facility, and finally placement at [DJJ].' "  (*Calvin S.*, *supra*, 5 Cal.App.5th at p. 528.)  Nevertheless, " 'there is no absolute rule that a [DJJ] commitment cannot be ordered unless less restrictive placements have been attempted.' "  (*Ibid.*)  A juvenile court properly considers the need to protect public safety and the role punishment should have in a minor's rehabilitation in considering less restrictive alternatives.  (*In re N.C.* (2019) 39 Cal.App.5th 81, 89 (*N.C.*).)

### A. Camp Sweeney

The record shows that the juvenile court considered but rejected appellant's proposed placement at Camp Sweeney.  There is no dispute that appellant—over 19 years of age at the time of disposition—was no longer eligible for Camp Sweeney based strictly on its age criteria.  That the juvenile court did not order Fort to make an exception for appellant does not demonstrate an abuse of discretion.  The court could reasonably find that the camp's policy exception for "extenuating circumstances" did not apply based

on Fort's example of what would justify an exception (e.g., a 19-year-old with a dependent child). Furthermore, although Fort indicated she would make an exception to the eligibility criteria if ordered to do so, the court could reasonably find this to be inappropriate given Fort's testimony that she would still have "reservations on how we would create an appropriate plan" for appellant. Fort also testified that Camp Sweeney's gang intervention programming had been suspended at the time of the disposition hearing, with no indication on when it might resume. On this record, the juvenile court could reasonably conclude that that Camp Sweeney was not an appropriate or effective alternative placement for appellant.

### B. Necessity of a Secured Placement

Appellant challenges the juvenile court's finding that a "secure environment" was necessary for him. In support, he requests judicial notice of the declaration of his counsel, Linda K. Harvie, in which Harvie states that on September 1, 2021, a DJJ court services representative confirmed by email that appellant was placed at DJJ's Pine Grove camp. Highlighting the fact that Pine Grove is not a locked facility, appellant argues that "the only conclusion a fact-finder can reach from DJJ's placement at [Pine Grove] is that [appellant] did not require placement in a 'secure environment.'" We deferred consideration of the judicial notice request pending our consideration of the merits of the appeal. We now deny it for the following reasons.

First, appellant does not present a proper subject for judicial notice. A "reviewing court may take judicial notice of any matter specified in [Evidence Code] Section 452." (Evid. Code, § 459, subd. (a).) Matters subject to permissive judicial notice under Evidence Code section 452 include laws, regulations, official government acts, court records and rules, facts of

21

common knowledge that cannot be reasonably be disputed, and facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputably accuracy. (Evid. Code, § 452, subds. (a)–(h).) While the Harvie declaration itself is capable of judicial notice as a court record (Evid. Code, § 452, subd. (d)), the truth of the matters asserted therein is not. (*Oh v. Teachers Ins. & Annuity Assn. of America* (2020) 53 Cal.App.5th 71, 81.)

Second, and more importantly, appellant's request pertains to facts that occurred more than seven months after the disposition order from which this appeal was taken. As the People correctly point out, our role as a reviewing court is to assess whether the lower court committed error based on the record before it at the time of rendition. (See *People v. Pearson* (1969) 70 Cal.2d 218, 221, fn. 1; *In re James* (1979) 90 Cal.App.3d 300, 304.) Accordingly, an appellate court errs if it receives and considers postjudgment evidence that was not before the juvenile court and relies on such evidence to reverse the judgment. (*In re Zeth S.* (2003) 31 Cal.4th 396, 412–413.)[12] Accordingly, we deny the request for judicial notice and decline to reach the arguments premised upon it.

Appellant further contends a secured environment was unnecessary because he was not a fully entrenched gang member and his gang membership was short-lived. We conclude there was ample evidence in the record from which the juvenile court could find that appellant was uniquely entrenched in gang life. Appellant's connection to gangs involved several generations and close members of his family, including his grandfather,

---

[12] While an appellate court may consider postjudgment developments that may be relevant in determining the mootness of issues on appeal (see *In re Cassandra B.* (2004) 125 Cal.App.4th 199, 207, fn. 3), that exception does not apply here.

uncle, brother, and most notably, his father, a leader in the HOGGs gang. Appellant's life was also uniquely impacted by the murders of several persons close to him and his family due to gang violence. Appellant identified with and glorified the HOGGs gang, and as late as January 2020, was involved in efforts to recruit a youth at juvenile hall into the HOGGs. On this record, substantial evidence reasonably supported a finding that placement in a secured facility would conform with the interests of public safety as well as appellant's rehabilitative objectives by minimizing appellant's exposure to negative influences in his family and community. (*N.C.*, *supra*, 39 Cal.App.5th at p. 89; *J.C.*, *supra*, 13 Cal.App.5th at p. 1217.)

### C. Placement with Uncles

Appellant contends the evidence did not support a finding that placement with either of his uncles (Villasana and Douangmala) would be inappropriate or ineffective. According to appellant, the probation department never bothered to contact or investigate the uncles to assess them for placement.

Although it appears the probation department did not interview Douangmala, the record discloses that a probation officer spoke to Low about both uncles as possible placement options. Additionally, Low herself provided the juvenile court with specific details about Douangmala, including his age, employment status, home, and his willingness to have appellant placed in his care and to assist with education, transportation, counseling, or other rehabilitative programming. As for Villasana, the record discloses he was interviewed by both Imperial and Low, and that Low testified in detail regarding her recommendation for alternative placement with Villasana. Although the juvenile court did not mention its consideration of the uncles in its disposition ruling, the court was not required to expressly state on the

23

record its reasons for rejecting less restrictive placements. (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1159.) Given the record before us, we are satisfied that the court considered the uncles as alternative placements.

We also conclude substantial evidence supported the implied finding that appellant's placement with either uncle would be inappropriate or ineffective. Because Douangmala resided in Minnesota and appellant suffered from a history of abrupt dislocations between states, the juvenile court could reasonably conclude that an out-of-state placement might interfere with appellant's rehabilitation and reintegration into the community near his immediate family. As for Villasana, the court could reasonably be concerned with his supervision over appellant given the court's previous finding in the transfer proceedings that appellant and Villasana discussed disconnecting appellant's phone "in order to hide potential evidence."

Additionally, the juvenile court had before it the probation department's disposition report indicating that appellant was not "truly confident enough or ready for a release to a family member currently" because there would "be much more freedom for the youth to interact with undesirable peers," reconnect with his gang associates, or "reignite exposure through social media." These observations were echoed by the SOS committee, which concluded that due to the sophistication and gang immersion in this case, and in light of public safety, appellant was not appropriate or ready for a release to a family member.

Based on the foregoing, we conclude the juvenile court did not abuse its discretion in finding that appellant's proposed less restrictive alternatives were inappropriate or ineffective.

**III.   Additional Contention Under *Carlos J.* and *Miguel C.***

Citing *Carlos J.*, *supra*, 22 Cal.App.5th 1 and *Miguel C.*, *supra*, 69 Cal.App.5th 899, appellant contends we must reverse and remand the matter so that the juvenile court can receive additional evidence relating to appellant's contention below that a DJJ commitment would be adverse to his rehabilitation because it would not allow him to continue with his same service providers or to engage in services in the community.

In *Carlos J.*, Division Five of this court reversed a DJJ commitment based on its finding that the People failed to identify any DJJ programs that would likely benefit the minor.  (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 10.) *Carlos J.* also provided guidance on the evidentiary showing required to a support a DJJ commitment.  First, the People must identify those DJJ programs that will likely benefit the minor, and if the minor has particular needs, the People should include brief descriptions of the relevant programs to address those needs.  (*Id.* at p. 12.)  The People are not initially required to provide "indepth" information "or to preemptively respond to even predictable criticisms" of DJJ.  (*Id.* at p. 13.)  But if the minor presents sufficient evidence reasonably calling into question the benefit the minor will receive from DJJ commitment, the People are obligated "to present more indepth information about [DJJ] in order to show probable benefit."  (*Id.* at p. 14.)

*Miguel C.* "pick[ed] up where *Carlos J.* left off[.]"  (*Miguel C.*, *supra*, 69 Cal.App.5th at p. 910.)  In *Miguel C.*, the People satisfied the initial showing required under *Carlos J.*, but the minor "countered with evidence that a DJJ commitment would actually be *adverse* to his rehabilitation given his particular needs[.]"  (*Ibid.*)  Specifically, the minor presented the expert opinion of clinical psychologist Dr. Gimel Rogers, who warned that because of the minor's "severe substance use disorders for alcohol and cannabis" and

25

moderate use disorder for methamphetamine (*id.* at p. 904), "a commitment to a higher level security environment such as the DJJ might put [the minor's] rehabilitative chances at risk by exposing him to more drugs, higher instances of violence, and a social structure revolving around gang affiliation." (*Id.* at pp. 904–905.) The probation department's report acknowledged Dr. Rogers's diagnosis "but said nothing about her conclusion that a DJJ placement would undermine rehabilitation." (*Id.* at p. 905.) *Miguel C.* held, "where a minor presents evidence suggesting that a DJJ placement would be harmful for reasons specific to the minor, the People must provide some contrary evidence that would enable the juvenile court to make a comparative analysis of the placement options *before* it concludes the minor will probably benefit from DJJ, and that less restrictive options would be ineffective or inappropriate." (*Id.* at p. 902.)

As previously discussed, the People here satisfied the initial showing under *Carlos J.* by providing informational materials and testimony about DJJ's programs. Appellant, meanwhile, argued that a DJJ commitment would not provide him "continuity of care from his service providers" or allow him "to engage in community-based" programs. These arguments were based on the November 13, 2020, letter by Low attached to the disposition brief in which she explained that appellant's tutor, Lynn Running, and his therapist, Reyes, would be able to continue their services with appellant if he were placed at an unlocked facility. Low opined that because appellant had developed strong positive relationships at juvenile hall, "[a] transition to a slightly less secure, structured setting would be buoyed by these strong positive relationships with staff. [Appellant] has already begun a rehabilitative process through programs, providers and staff at JJC, and he would be able to continue these important relationships at Camp Sweeney."

26

We find the instant matter distinguishable from the issue addressed in *Miguel C.,* because Low's letter was not evidence that a DJJ commitment would be "*harmful* for reasons *specific* to the minor." (*Miguel C., supra,* 69 Cal.App.5th at p. 902, italics added.) Low did not warn that appellant would be harmed by the discontinuation of his services with Running and Reyes due to a particular diagnosis or need on his part. Rather, Low maintained that those strong relationships would "buoy[]" his transition to a less secured environment like Camp Sweeney, and that he would "thrive" if those existing relationships were allowed to continue in a community-based setting. This was evidence in favor of a less restrictive placement, not evidence of specific harms from a DJJ commitment. Low did not otherwise dispute the availability or efficacy of comparable educational and mental health programs at DJJ or opine that any specific condition at DJJ would undermine appellant's rehabilitation based on his particular needs. By itself, appellant's inability to continue with existing service providers in the community was not a harm "specific to" him, but rather, a limitation affecting every ward committed to DJJ after juvenile hall.[13] Accordingly, Low did not offer evidence comparable to the defense evidence presented in *Miguel C.*

Furthermore, the record already contains evidence responsive to the substance of Low's letter. As we have discussed, substantial evidence supported the juvenile court's express and implied findings that placements at Camp Sweeney or with appellant's uncles would be inappropriate or ineffective, and that an unsecured placement also posed risks to public safety and to appellant's rehabilitative goal of fully disengaging from gang

---

[13]     As Custino explained, "[t]he youth do not go out into the community. The community partners come to us. . . . [¶] . . . [¶] . . . We are a locked facility so they don't go into the community."

influence. Accordingly, this was not a situation where the minor's evidence revealed a lack of depth in the People's initial showing so as to require additional information in order for the court to make an informed comparative analysis of the available placement options. (*Miguel C.*, *supra*, 69 Cal.App.5th at p. 902.)

In short, because appellant did not present evidence that a DJJ commitment would be harmful for reasons specific to him, the People were not obligated to produce additional evidence before the juvenile court could commit appellant to DJJ.

### DISPOSITION

The disposition order is affirmed.

_____

Fujisaki, Acting P. J.

We concur:

_____

Petrou, J.

_____

Rodríguez, J.

A162265