Filed 9/18/25  P. v. Chenot CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KIMBERLY ROSANNE CHENOT,<br><br>Defendant and Appellant. | F088501<br><br>(Super. Ct. No. CRF14-0012187)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Mariposa County.  Michael A. Fagalde, Judge.

Paboojian Inc., Warren R. Paboojian and Tara A. Sarabian for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Amanda D. Cary and Joseph Penney, Deputy Attorneys General, for Plaintiff and Respondent.

Duran Law Office and Jack Duran, Jr., for L.C. as Amicus Curiae on behalf of Plaintiff and Respondent.

-ooOoo-

Defendant Kimberly Rosanne Chenot appeals from an order for victim restitution pursuant to Penal Code[1] section 1202.4, subdivision (f). She contends the trial court: (1) "abused its discretion in awarding the amount of restitution it did" (capitalization omitted); and (2) "committed legal error in its award of pre-judgment interest" (capitalization omitted). We disagree and affirm the order.

## BACKGROUND

### I. Defendant's convictions and sentence

On June 22, 2014, defendant intentionally caused a propane gas leak at the Midpines residence of L.C., which resulted in an explosion and fire. Defendant was charged with arson of an inhabited structure during and within an area of a state of emergency (§ 454, subd. (a)(2) [count I]), criminal threats (§ 422 [count II]), and driving a motor vehicle when her privilege to do so was suspended for driving under the influence (Veh. Code, § 14601.2, subd. (a) [count III]). In connection with counts I and II, the information alleged she was previously convicted of assault upon a peace officer with a deadly weapon, a qualifying "strike" under the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and a serious felony (§ 667, subd. (a)(1)).

Defendant was convicted on counts I and II and the special allegations were found true. The trial court imposed an aggregate sentence of 24 years four months: a doubled upper term of 18 years on count I, 16 months on count II, and five years for the prior serious felony enhancement.

---

[1] Unless otherwise indicated, subsequent statutory citations refer to the Penal Code.

## II. Determination of victim restitution award

At the April 30, 2015 sentencing hearing, the trial court reserved the issue of victim restitution. In early 2023, the People requested a restitution hearing. Said hearing was eventually scheduled for July 10, 2024.[2]

### a. *Prehearing briefs*

#### i. The People

In a brief filed February 1, 2024, the People argued L.C. "suffered the loss of her family home and possessions," "has been living in a trailer on the property for the last few years, just trying to get by," and was entitled to restitution "for the replacement of her house and all its contents" (boldface & capitalization omitted). The People further asserted the court "must award interest at the legal rate of 10 percent per year" and asked for accrual "from the date of the loss in this case."

Two estimates for the cost of constructing a new house were provided. David Lawson, a general building contractor, indicated a 962-square-foot home would cost $312,650, or $325 per square foot. Randy Brower, an owner-operator of a construction company, declared "the construction of [a] standard single-family home in Mariposa County for 2024 is between $250 to $300 per square foot," i.e., between $240,500 and $288,600 for a 962-square-foot home.

Estimates were also given for the following items: (1) $25,000 for "two (2) 10 [inch] x 10 [inch] Southern Sierra Miwuk Twined Basket[s]"; (2) an aggregate $10,484 for a wood stove, two couches, two rocking chairs, a flatscreen television, an amplifier, a stereo receiver, two DVD recorders, clothing, three oriental rugs, silverware, bath towels, dishes, pots and pans, a daybed, a hutch, six lamps, a kitchen table, a washer and dryer, a coffee pot, blankets, and a toaster oven; and (3) an aggregate $22,420 for a greenhouse, a

---

[2] At oral argument, counsel for defendant stated the People's request was made at or around the time defendant prevailed in a separate, unrelated wrongful death action.

shed, a Chevy Blazer sports utility vehicle, jewelry, two handguns, two electric guitars, a sleigh bed and bedroom set, an antique steam trunk, two antique baby dolls, and two laptop computers. The baskets were appraised by W.C., a tribal anthropologist and L.C.'s nephew. The Kelley Blue Book guide valued the Chevy Blazer at $7,200. Estimates for most of the remaining items were based on the current prices of new but comparable items sold online.

In a second brief filed July 10, 2024, the People supplied estimates for the following services: (1) $19,363 for well drilling; (2) $13,744.16 for a well pump and accessories; (3) $2,500 for septic system repairs; (4) $585 for architectural construction plans for the rebuilding project; (5) $8,000 for property cleanup; and (6) between $11,800 and $13,800 for installation of a new electrical pole.

### ii. Defendant

In a brief filed July 10, 2024, defendant maintained L.C.'s residence was a "used mobile home" and "the appropriate measure of loss" "would be the cost of a used mobile home in 2014 that was similar to the used mobile home that served as [L.C.'s] residence and the cost of like-kind contents in 2014." She also claimed interest "should be based on replacement costs of 'like property' " as of June 2014.

### b. *Hearing*

#### i. Witnesses for the People

Lawson testified he had 41 years of experience as a general contractor and built 260 single-family residences, most of which are located in Mariposa County and "[a] handful of them" in Midpines. He opined the cost to replace a 962-square-foot "slab on grade, stick-framed house" with "[e]ither a metal roof or a textured one" in 2014 "would have been roughly $300,000," i.e., "plus or minus" $300 per square foot. By contrast, the current cost would range between "around $400 to $425" and "$500, $550" per square foot. Lawson acknowledged he specialized in the construction of "[m]iddle to high-end" homes and did not typically build tract housing, which would cost "substantially less."

S.C.—L.C.'s niece—testified L.C. originally lived in a trailer in 1979 and had "a living room added onto her trailer" at some point. Subsequently L.C. received a grant for new housing construction. S.C. recalled "the contractor just built off of and left [L.C.'s] living room that was there and built the rest of the house, the other bedrooms and everything else." The residence, which S.C. affirmed was "[a] regular conventional home" as opposed to "a mobile home," was approximately 900 square feet.

C.S. testified she helped S.C. obtain an estimate from Lawson on L.C.'s behalf. C.S. once visited L.C.'s house in 1999. She knew the difference between a "conventional stick-built home" and a "mobile home" and attested L.C.'s house was the former.

W.C. testified the two Native-American "gathering baskets" destroyed in the fire were woven by "a famous basket weaver" whose works are "non-replaceable" and auctioned at "very expensive" prices. In the past, he attempted to procure a "two-and-a-half to three-inch basket bowl" valued at $10,000. Other baskets have fetched "all the way up to $140,000 and even more." W.C. acknowledged he relied on L.C.'s descriptions of the baskets and neither personally observed the baskets nor reviewed photographs thereof. After consulting with a university professor and archeologist, W.C. opined the two baskets were collectively worth $25,000.

L.C. testified her residence in 1979 was a "one-bedroom, one bath" "Sandpoint trailer" that originally belonged to her grandfather. When her son grew older, she "added on a den and a bedroom." After receiving a "Block Grant," the trailer was relocated "to the side" and "the rest of the house" was built in or around 1984. The house was approximately 930 square feet with two bedrooms, a front room, a kitchen, and a wraparound deck. L.C. confirmed the house was "a conventional-type home" built "from scratch" with a foundation and framing. The explosion and fire destroyed not only the house and other outbuildings (i.e., greenhouse, shed) but also L.C.'s personal property in and around those structures. L.C., with the assistance of her niece S.C., based the estimates of most of her personal property losses on the current retail value of new but

5.

comparable items sold online. The gathering baskets were appraised by L.C.'s nephew W.C. L.C. also received estimates from professionals for the following services: (1) $8,000 for the removal of fire debris; (2) $2,000 for septic repair; (3) $19,000 for drilling a new well; (4) $13,744.16 for a well pump and other accessories; and (5) $13,000 for installation of a new electrical pole. When L.C. was asked whether she needed "a complete new well," she responded, "I'm not sure."

### ii. Witness for defendant

Kerry Wolf, a general contractor with 30 years of experience, testified he did not visit the site of the explosion and fire but reviewed photographs thereof. He concluded L.C.'s home was a trailer with an addition. Wolf opined a "brand new trailer" would cost "about $75,000," i.e., $75 per square foot, whereas a "good used trailer[]" would cost between $30,000 and $40,000. These estimates were based on 2018 values because his research "couldn't go back to 2014."[3] Regarding the well, Wolf highlighted the lack of an inspection to "[en]sure that there's something wrong with the casing and the pump" made the estimate premature. Photographs of the scene showed "the telephone pole was perfectly fine," so installation of a new pole was unnecessary.

### c. *Ruling*

On August 5, 2024, the court filed a "Judgment on Restitution," which read:

> "A contested Restitution Hearing was heard in this court on July 10, 2024. After a review of the file and after consideration of the testimony and evidence presented at that hearing, the Court finds the People proved by a preponderance of the evidence that [L.C.] is entitled to a judgment for restitution against the Defendant as follows:

---

[3] Wolf testified he evaluated a Mariposa County Fire Department report, which assessed damages to a "structure" and "the content" therein at $40,000 and $20,000, respectively. Wolf suggests "structure" was a reference to L.C.'s residence. The record indicates Wolf was incorrect: the report assessed damages to (1) L.C.'s residence and the items therein at $120,000 and $60,000, respectively; and (2) the outbuildings and the items therein at $40,000 and $20,000, respectively.

"1.     Residence . . . that was totally destroyed in the explosion/fire caused intentionally by the Defendant.  [¶]  -930 square feet (per the testimony of [L.C.]) at $250 per square foot = **$232,500**

"2.     Contents of house, outbuildings, and Chevy Blazer = **$25,000**

"3.     Site clean-up = **$8,000**

"4.     Septic Repair = **$2,000**

"5.     Well repair:  pump replacement and new pressure system = **$13,744**

"6.     2 . . . Gathering Baskets (described by [L.C.] as 4-8 inches each in diameter[4]) = **$10,000 total**

"Total Judgment = **$291,244**

"The judgment shall be subject to interest at the rate of 10% per annum pursuant to . . . section 1202.4(f)(3)(G), computed from the date of the loss – June 22, 2014.

"Further, the Court finds the People failed to make a prima facie showing as to the need to drill a new well, or to provide a new power pole and power lines."

An "Order for Victim Restitution" (capitalization omitted) was filed August 13, 2024.

## **DISCUSSION**[5]

## I.     **Pertinent law**

"Crime victims have a constitutional right to restitution for losses resulting from criminal acts against them."  (*People v. Shelly* (2022) 81 Cal.App.5th 181, 198 (*Shelly*),

---

[4] L.C. testified to these measurements at the hearing.

[5] L.C. filed an amicus curiae brief in support of the People.  "[N]ormally an appellant determines the issues on appeal and normally [an appellate] court will consider only evidence presented to the trial court."  (*People v. Hannon* (2016) 5 Cal.App.5th 94, 106.)  " 'California courts refuse to consider arguments raised by amicus curiae when those arguments are not presented in the trial court, and are not urged by the parties on appeal.  " 'Amicus curiae must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curi[a]e will not be considered.' " ' [Citations.]"  (*Id.* at p. 105.)  "We will only consider

citing Cal. Const., art. I, § 28, subd. (b)(13); accord, *People v. Stanley* (2012) 54 Cal.4th 734, 736 (*Stanley*).) "The Legislature has enacted section 1202.4 to implement this constitutional right." (*Shelly*, *supra*, at p. 198; accord, *Stanley*, *supra*, at p. 736.) Section 1202.4, subdivision (f) provides in part:

> "[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court. . . . [¶] . . . [¶]

> "(3) To the extent possible, the restitution order . . . shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to, all of the following:

> "(A) Full or partial payment for the value of stolen or damaged property. The value of stolen or damaged property shall be the replacement cost of like property, or the actual cost of repairing the property when repair is possible. [¶] . . . [¶]

> "(G) Interest, at the rate of 10 percent per annum, that accrues as of the date of sentencing or loss, as determined by the court."

"The purpose of direct victim restitution . . . is to reimburse the victim for economic losses caused by the defendant's criminal conduct, i.e., to make the victim reasonably whole." (*People v. Holman* (2013) 214 Cal.App.4th 1438, 1451.) "A victim's restitution right is to be broadly and liberally construed." (*People v. Mearns* (2002) 97 Cal.App.4th 493, 500 (*Mearns*); accord, *Stanley*, *supra*, 54 Cal.4th at p. 737.)

"A defendant has a right to a hearing 'to dispute the determination of the amount of restitution.' " (*Shelly*, *supra*, 81 Cal.App.5th at p. 198, quoting § 1202.4, subd. (f)(1).) " 'The standard of proof at a restitution hearing is preponderance of the evidence, not

---

those arguments by amic[us] curiae which are raised by the parties on appeal and address them in conjunction with the parties' arguments." (*Qaadir v. Figueroa* (2021) 67 Cal.App.5th 790, 794, fn. 1.)

reasonable doubt.' [Citation.]" (*Shelly*, *supra*, at p. 198.) "Section 1202.4 does not, by its terms, require any particular kind of proof." (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542–1543 (*Gemelli*).) " ' " '[S]entencing judges are given virtually unlimited discretion as to the kind of information they can consider' " ' in determining victim restitution. [Citation.]" (*People v. Phu* (2009) 179 Cal.App.4th 280, 283–284; see, e.g., *People v. Millard* (2009) 175 Cal.App.4th 7, 26 [victim's testimony]; *People v. Keichler* (2005) 129 Cal.App.4th 1039, 1048 [probation report].) "Once the victim makes a prima facie showing of economic losses incurred as a result of the defendant's criminal acts, the burden shifts to the defendant to disprove the amount of losses claimed by the victim." (*Gemelli*, *supra*, at p. 1543.) "The defendant has the burden of rebutting the victim's statement of losses, and to do so, may submit evidence to prove the amount claimed exceeds the repair or replacement cost of damaged or stolen property." (*Ibid.*)

## II.     Standard of review

"A restitution order is reviewed for abuse of discretion and will not be reversed unless it is arbitrary or capricious." (*Gemelli*, *supra*, 161 Cal.App.4th at p. 1542.) "No abuse of discretion will be found where there is a rational and factual basis for the amount of restitution ordered." (*Ibid.*; see *Mearns*, *supra*, 97 Cal.App.4th at p. 498 [" '[T]he trial court must use a rational method that could reasonably be said to make the victim whole . . . .' "].) "In reviewing restitution orders, we do not reweigh the evidence or make credibility decisions. Our review is to determine whether there is sufficient evidence to support the inferences made by the trial court." (*People v. Baudoin* (2022) 85 Cal.App.5th 1184, 1191.) "In reviewing the sufficiency of the evidence, the ' "power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the trial court's findings.' [Citations.] Further, the standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt. [Citation.] 'If the circumstances reasonably justify the [trial court's] findings,' the judgment may not be

9.

overturned when the circumstances might also reasonably support a contrary finding. [Citation.]" (*People v. Baker* (2005) 126 Cal.App.4th 463, 468–469; see *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 [reviewing court required to uphold a discretionary ruling "if it is correct on any basis, regardless of whether such basis was actually invoked"].)

"[W]hen the propriety of a restitution order turns on the interpretation of a statute, a question of law is raised, which is subject to de novo review on appeal." (*People v. Williams* (2010) 184 Cal.App.4th 142, 146.)

## III.  Analysis

### a.  *L.C.'s residence*

At the outset, defendant contends "there is no evidentiary support to award $232,500.00 in replacement cost damages for a 35-year-old mobile home, less than a thousand square feet in size."

The premise L.C.'s residence was a mobile home at the time of the explosion and fire is undermined by substantial evidence.  L.C. testified she originally inhabited a trailer and "added on a den and a bedroom" sometime before the mid-1980's.  When she received a grant for new housing construction, the trailer was relocated "to the side" and the "rest of the house" was built "from scratch" with a foundation and framing in or around 1984.  S.C.'s testimony corroborated L.C.'s account.  In addition, C.S. testified she visited L.C.'s residence in 1999 and confirmed it was a "conventional stick-built home."  On the other hand, Wolf—defendant's sole witness—never observed L.C.'s residence and based his valuation on photographs of the site after the explosion and fire. Thus, the court could reasonably reject defendant's assertion the replacement cost of a mobile home could suitably represent the value of L.C.'s residence.

We also conclude the court's $232,500 award was neither arbitrary nor capricious. The court calculated this amount by:  (1) accepting L.C.'s testimony that her house was 930 square feet; and (2) adopting a rate of $250 per square foot.  Regarding the latter, two

10.

contractors provided estimates on L.C.'s behalf. Lawson, who initially proposed a rate of $325 per square foot, presented a reduced rate of "plus or minus" $300 per square foot at the hearing. Brower, who did not testify, signed a declaration in which he opined "the construction of [a] standard single-family home in Mariposa County for 2024 is between $250 to $300 per square foot." In selecting Brower's lower rate of $250 per square foot, one could deduce the court believed Lawson's rate of approximately $300 per square foot was inflated in light of his testimony that he specialized in the construction of "[m]iddle to high-end" homes.

b. *L.C.'s personal property and service charges*

Next, defendant contends the court abused its discretion when it awarded L.C. $25,000 for "Contents of house, outbuildings, and Chevy Blazer."[6]

The record shows L.C. provided estimates of $7,200 for the Chevy Blazer (taken from a Kelley Blue Book guide) and $6,320 total for a greenhouse and shed (taken from an Internet search). A court could reasonably find this evidence sufficiently established the values of L.C.'s vehicle and outbuildings. (See *Gemelli*, *supra*, 161 Cal.App.4th at pp. 1542–1543 [§ 1202.4 does not require particular kind of proof]; see also *Martinez v. Enterprise Rent-A-Car Co.* (2004) 119 Cal.App.4th 46, 56 ["The retail value [of a vehicle] can be obtained from a widely accepted source such as the Kelley Blue Book."].) The remaining $11,480 of the $25,000 award necessarily covered "Contents of house," an amount less than what L.C. had requested. (See *ante*, at p. 3.) This discrepancy may best be explained by L.C.'s failure to attach additional evidence of value—i.e., Internet printouts—for several items. We conclude the $25,000 award was neither arbitrary nor capricious.

Defendant also contends the court erroneously awarded L.C. $8,000 for "Site clean-up"; $2,000 for "Septic Repair"; and $13,744 for "Well repair:  pump replacement

---

[6] Defendant does not challenge the $10,000 award for the gathering baskets.

and new pressure system."  At the hearing, L.C. testified she received such estimates from professionals.  A victim's testimony may constitute a prima facie case for restitution.  (*People v. Millard*, *supra*, 175 Cal.App.4th at p. 26.)  We conclude the aforementioned awards were neither arbitrary nor capricious.

    c.  *Interest*

Finally, "section 1202.4, subdivision (f)(3)(G), specifically *requires* the trial court to order a criminal defendant to make restitution to the victim based on the amount of the loss claimed by the victim.  The order *must* fully reimburse the victim for every economic loss caused by the defendant's criminal conduct, including 10 percent interest as of the date of [sentencing or] loss."  (*People v. Wickham* (2013) 222 Cal.App.4th 232, 238, fn. omitted; see § 1202.4, subd. (f)(3)(G) [restitution amount "shall" include "[i]nterest, at the rate of 10 percent per annum, that accrues as of the date of sentencing or loss"].)[7] Here, the court complied with the statute and awarded interest "at the rate of 10% per annum" "computed from the date of the loss – June 22, 2014."

Defendant suggests interest should not be awarded because it would be "based off current replacement costs as opposed to replacement values from the date of loss in 2014."  She presents no legal authority in her briefs—nor did she provide any such authority at oral argument—for the proposition interest may be relinquished on this basis. Under section 1202.4, subdivision (f)(3)(A), the value of the damaged property "shall be the replacement cost of like property . . . ."  The statute does not mention either "current replacement costs" or "replacement values from the date of loss."  In addition, case law has recognized a restitution award can account for the appreciation of a replacement cost over time.  (See, e.g., *People v. Ung* (2023) 88 Cal.App.5th 997, 1002 [value of stolen

---

    [7] Because this language is unequivocal, the rule of lenity is inapplicable.  (See *People v. Reynoza* (2024) 15 Cal.5th 982, 1012 [" ' "[The rule of lenity] requires that 'ambiguity in a criminal statute should be resolved in favor of lenity, giving the defendant the benefit of every reasonable doubt on questions of interpretation.' " ' "].)

cryptocurrencies incorporated "increase in dollars required to buy them in the markets at the time of replacement"].) Hence, to the extent defendant believes a property's value must be limited to its cost of replacement at a fixed point in the past, she is mistaken.

As to whether a court may have inherent authority to ignore statutory language and exclude interest from a victim restitution order, no cases have addressed this exact scenario. However, it is highly unlikely such authority exists. In *People v. Tanner* (1979) 24 Cal.3d 514, 518, the California Supreme Court held a trial court erroneously disregarded the mandatory language of section 1203.06 and struck a jury finding that the defendant used a firearm during the commission of a robbery.[8] In a footnote, the high court pronounced:

> "We reject any contention that courts are inherently or constitutionally vested with ultimate authority in fixing sentences or imposing penalty enhancing factors for conduct made criminal by legislative enactment. '[S]ubject to the constitutional prohibition against cruel and unusual punishment, the power to define crimes and fix penalties is vested exclusively in the legislative branch.' [Citation.]" (*People v. Tanner*, *supra*, 24 Cal.3d at p. 519, fn. 3.)

In other words, where a statute is clear and unambiguous (and otherwise constitutional), a court does not have inherent discretion to disregard the language in the defendant's favor. (See *In re J.C.* (2017) 13 Cal.App.5th 1201, 1207 [" 'Courts do not sit as super-legislatures to determine the wisdom, desirability or propriety of statutes enacted by the Legislature.' "].) In tandem with the notion "[a] victim's restitution right is to be broadly and liberally construed" (*Mearns*, *supra*, 97 Cal.App.4th at p. 500), it appears the law compels interest to be included in the victim restitution order.

---

[8] At the time of this case, section 1203.06, subdivision (a)(1)(iii) read: " 'Probation shall not be granted to' " " '[a]ny person who used a firearm during the commission . . . of' " "[r]obbery." (*People v. Tanner*, *supra*, 24 Cal.3d at p. 518, fn. 1, italics omitted.)

## **DISPOSITION**

The victim restitution order is affirmed.

DETJEN, J.

WE CONCUR:


HILL, P. J.


DE SANTOS, J.